MAYOR AND CITY COUNCIL OF BALTIMORE
*v.* BALTIMORE GAS AND ELECTRIC
COMPANY

[No. 57, September Term, 1959.]

*Decided December 11, 1959.*

The cause was argued before BRUNE, C. J., and HENDER-
SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Ambrose T. Hartman, Deputy City Solicitor of Baltimore,* with whom was *Harrison L. Winter, City Solicitor,* on the brief, for the appellant.

*William Baxter,* with whom were *Alfred P. Ramsey, Paul S. Clarkson* and *Richard F. Ober* on the brief, for the appellee.

BRUNE, C. J., delivered the opinion of the Court.

The City of Baltimore (the City) appeals from a final order, a declaratory and monetary judgment, in favor of Baltimore Gas & Electric Company (the Company) entered by one of the law courts of Baltimore in a proceeding instituted by the Company. The ultimate question is whether or not the City is obligated to pay compensation to the Company for the Company's costs of removal, relocation, reconstruction or abandonment (as the case may be) of its public utility facilities located in public streets or highways comprised within a redevelopment area, which were incurred by reason of the City's redevelopment of the area and the consequent closing of some of the streets and alleys therein. (There is no question as to the amount payable, if the City is liable at all.)

The area is the same area which was involved in *Herzinger v. Baltimore,* 203 Md. 49, 96 A. 2d 3, 98 A. 2d 87. The question now presented is similar to that involved in *Baltimore Gas & Electric Co. v. State Roads Commission* (referred to below as the *Harbor Tunnel* case), 214 Md. 266, 134 A. 2d 312, which the trial court held to be controlling in the instant case. In the *Harbor Tunnel* case this Court stated at the outset (214 Md. at 270) that "[u]nless the Legislature directs to the contrary, the rule is that a public utility must, at its own expense, remove and relocate its service facilities in, on or under a public road or other land owned by the State if this is made necessary by improvement or extension of the road system." The Company contends that, under the constitutional and legislative provisions here involved, there are directions that its removal and like costs shall be paid. It also contends that the rule is applicable only in cases involving what it calls "public projects for normal highway uses (*e.g.,* sewer pipes,

storm drains, etc.) or improvements (*e.g.,* street widening, regrading, etc.)" and does not apply where the City is engaged in a proprietary function, as the Company asserts that it is in the instant case. The trial court sustained the Company's first contention and found it unnecessary to pass on the second.

Section 1 of Article XI-B of the State Constitution provides as follows:

> "The General Assembly of Maryland, by public local law, may authorize and empower the Mayor and City Council of Baltimore:
>
> "(a) To acquire, within the boundary lines of Baltimore City, land and property of every kind, and any right, interest, franchise, easement or privilege therein, by purchase, lease, gift, condemnation or any other legal means, for development or redevelopment, including, but not limited to, the comprehensive renovation or rehabilitation thereof; and
>
> "(b) To sell, lease, convey, transfer or otherwise dispose of any of said land or property, regardless of whether or not it has been developed, redeveloped, altered or improved and * * * [however] acquired, to any private, public or quasi public corporation, * * * person or other legal entity." [1]

Section 2 of Article XI-B provides in part as follows:

---

1. Section 1 also provides:

"No land or property taken by the Mayor and City Council of Baltimore for any of the aforementioned purposes or in connection with the exercise of any of the powers which may be granted to the Mayor and City Council of Baltimore pursuant to this Article by exercising the power of eminent domain, shall be taken without just compensation * * * being first paid or tendered to the party entitled to such compensation.

"All land or property needed, or taken by the exercise of the power of eminent domain, by the Mayor and City Council of Baltimore for any of the aforementioned purposes or in connection with the exercise of any of the powers which may be granted to the Mayor and City Council of Baltimore pursuant to this Article is hereby declared to be needed or taken for a public use."

"The General Assembly of Maryland may grant to the Mayor and City Council of Baltimore any and all additional power and authority necessary or proper to carry into full force and effect any and all of the specific powers which the General Assembly is authorized to grant to the Mayor and City Council of Baltimore pursuant to this Article and to fully accomplish any and all of the purposes and objects contemplated by the provisions of this Article, provided such additional power or authority is not inconsistent with the terms and provisions of this Article or with any other provision or provisions of the Constitution of Maryland."

This Section also authorizes the General Assembly to impose limitations or restrictions upon the exercise of any powers granted under Article XI-B.

In accordance with Article XI-B in its present form,[2] the General Assembly, by Chapter 217 of the Acts of 1949, granted redevelopment powers to the City by adding Paragraph 14A to the enumerated powers of the City stated in Section 6 of its Charter.

The first sub-paragraph, (a), of Par. 14A granted to the City power "To acquire, within the boundary lines of Baltimore City, land and property of every kind, and any right, interest, franchise, easement or privilege therein, *including land or property and any right or interest therein already devoted to public use,* by purchase, lease, gift, condemnation or any other legal means, for development or redevelopment, including but not limited to, the comprehensive renovation or rehabilitation thereof;" subject to a proviso not here material. (Italics supplied.) The language quoted is identical with that of Sec. 1 (a) of Article XI-B, *supra,* except for the addition of the italicized clause.

The second sub-paragraph, (b), of Par. 14A of the City Charter affirmatively and expressly granted power to the

---

2. Art. XI-B of the Constitution as now amended was proposed by Ch. 162 of the Acts of 1947 and was ratified at the November, 1948, election.

City "[t]o develop or redevelop, including but not limited to, the comprehensive renovation or rehabilitation of, any and all land or property acquired by any of the methods hereinbefore mentioned". The third sub-paragraph, (c), restates and amplifies the provisions of paragraph (b) of Sec. 1 of Article XI-B, *supra*, and adds a clause that any leases entered into shall be deemed to be exclusively for business or commercial purposes, and that unless otherwise specifically agreed, no lessee or tenant shall have the right to redeem the rent reserved. None of the other sub-paragraphs of Section 14A seem material to the present controversy, except (g), which authorized the City to create a suitable board, commission, department, bureau or other agency and to vest in it jurisdiction and authority to exercise powers granted under Par. 14A. By Ordinance No. 718, approved June 2, 1949, such powers were vested in the Baltimore Redevelopment Commission. In 1956 its powers and duties were transferred by ordinance to the Baltimore Urban Renewal and Housing Agency.

Ordinance No. 718, above referred to, provided that the Baltimore Redevelopment Commission should "exercise on behalf of the Mayor and City Council the powers contained in Paragraph 14A, Section 6 of the Baltimore City Charter (1946 Edition), as added by Chapter 217 [of the Acts of 1949] * * *, together with such other powers and duties as may be legally delegated to it by the Mayor and City Council subject, however, to the limitations contained herein." It further provided, in part, that, subject to the approval of the Board of Estimates, the Commission might expend funds available to it for "the acquisition, by purchase, lease, gift, condemnation, or any other legal means, of land or property and any right, interest, franchise, easement or privilege therein, including land or property and any right or interest therein already devoted to public use, in the City of Baltimore, for development or redevelopment, including, but not limited to, the comprehensive renovation or rehabilitation thereof *and for the payment of any and all costs and expenses incurred in connection with, or incidental to, the acquisition of said land or property, and for the demolition, removal, relocation,*

*renovation or alteration of land, buildings, streets, highways, alleys, utilities or services, and other structures or improvements, and for the construction, reconstruction, installation, relocation or repair of streets, highways, alleys, utilities or services, in connection with the development or redevelopment of land or property, including the comprehensive renovation or rehabilitation thereof, as aforesaid; * * *."* (Italics supplied). This portion of Ordinance No. 718, prior to the italics, is taken almost *verbatim* from Paragraph 14A (a) of Sec. 6 of the Baltimore City Charter, *supra*. The italicized portion originated in the Ordinance.

We have no doubt that the italicized language in the section just quoted is broad enough to warrant the payments which the Company seeks by way of reimbursement for the cost of removing, relocating or reconstructing some of its utility facilities as a result of the closing of some streets and alleys in the redevelopment area or for the depreciated value of some utility facilities abandoned for the same reason. The City contends that the word "utilities" does not refer to the physical properties or facilities of a utility company used for the purpose of furnishing gas or electric services to customers. We are quite unable to accept this argument. The word "utilities" obviously could not refer to the corporate entities which furnish utility services; it is not their removal, relocation or reconstruction which the Ordinance contemplates as a part of a redevelopment project. The term is used in its popular significance of utility facilities—a meaning which is made all the clearer by its being coupled with the word "services".

We come then to the heart of the case—do the controlling constitutional and statutory provisions permit the City to enact an Ordinance providing for the payment of the costs of removal, relocation, and the like, of utility facilities as part of a redevelopment project? The validity of these provisions of the Ordinance must, of course, rest upon their being within the powers granted to the City, since municipal corporations have only the powers conferred upon them by the Constitution or by the Legislature. *City of Baltimore v. Canton*

*Co.*, 186 Md. 618, 631, 47 A. 2d 775; *Mayor and Council of Mt. Airy v. Sappington*, 195 Md. 259, 263, 73 A. 2d 449.

Much of the argument in this case has been directed to whether or not the language of Article XI-B, Sec. 1 (a) of the Constitution and of Paragraph 14A (a) of Sec. 6 of the City Charter, enacted by Ch. 217 of the Acts of 1949, relating to the acquisition of land and property, or franchises, easements, or other interests therein, is broad enough to authorize the provisions of the Ordinance which empower the Commission (subject to the approval of the Board of Estimates) to make payment of the costs of demolition, removal, relocation or reconstruction of streets, highways, alleys, utilities or services in connection with the redevelopment of land. Article XI-B, Sec. 1 (a) and Par. 14A (a) are not the only provisions of Article XI-B or of Par. 14A to be considered in determining the City's power to enact these provisions of the Ordinance. Article XI-B manifests a clear purpose to authorize the Legislature to grant full powers to the City (subject to limitations not here material) to deal with the problem of urban redevelopment. Not only does it authorize the Legislature to empower the City to acquire land and property of every kind, and interests therein, but also (by Sec. 2) it authorizes the Legislature to grant to the City any and all additional power and authority necessary or proper to carry into full force and effect any and all of the specific powers which the Legislature is authorized to grant pursuant to Article XI-B and to fully accomplish any and all of the purposes and objects contemplated by the provisions of Article XI-B.

By sub-paragraph (b) of Par. 14A of the City Charter the General Assembly undertook to exercise its authority under Article XI-B to make a broad, general grant of urban redevelopment powers to the City by authorizing it "[t]o develop or redevelop * * * any and all land or property acquired by any of the methods hereinbefore mentioned". This general grant is not limited to redevelopment by the City itself or by any agency thereof. Sub-paragraph (c) (pursuant to the authorization contained in Article XI-B, Sec. 1 (b)) empowers the City to sell, lease, convey, etc., land or property,

whether redeveloped or not and however acquired, to the United States, the State, or any department or agency thereof or to any private, public or quasi public corporation, etc., for development or redevelopment.

Pursuant to sub-paragraph (c), *supra,* and Ordinance No. 718, the City has sold some of the property acquired in the area in question to The Johns Hopkins Hospital (which is located across the street from the east side of this area) for use for a dormitory and a parking area, has agreed to convey or transfer other parts of the area to a church and to certain City departments, and has leased other lots in the tract to a private corporation for redevelopment by building apartment houses, hotel, office and building neighborhood stores thereon. In furtherance of the plan for redevelopment of this area the City has adopted two ordinances for the closing of certain streets and alleys within the area. As a result, the Company has had to discontinue both gas and electric services through the beds of those streets and alleys and to effect relocations thereof.

The closing of some streets and alleys in an urban area undergoing renewal is an expectable incident of the rehabilitation or redevelopment of such an area. Such closings and consequent removals or relocations of utility facilities (or the abandonment of such facilities as it may be uneconomic to remove) in order to carry out a plan of redevelopment are to be anticipated. The constitutional authorization for the grant of all powers necessary or proper to fully accomplish any and all of the purposes and objects contemplated by the Redevelopment Article is broad enough, we think, to cover provisions dealing with such incidents of a plan of redevelopment. We also think that the terms of the statute (Par. 14 A of the City Charter) are broad enough to authorize the City to enact an ordinance dealing with such normal incidents of redevelopment as those here involved. We may add that sub-paragraph (a) thereof shows that the General Assembly was well aware of the existence of property, or of rights or interests therein, already devoted to public use, which might be acquired; and we think the words employed were clearly

broad enough to cover the property of a public utility company devoted to rendering service to the public.

The Company specifically disclaims making any claim for the value of any easements, franchises, or privileges. We, therefore, need not consider the value of any easements acquired through the exercise of its franchises. Cf. *Consolidated Gas Co. v. City of Baltimore,* 101 Md. 541, 61 A. 532. See also the *Harbor Tunnel* case. No contention has been made by the City that any claims for the costs of removal, relocation, etc., or for the value of property abandoned because of the street closings should have been asserted in the proceedings under the closing ordinances. Cf. *City of Baltimore v. Himmelfarb,* 172 Md. 628, 632, 192 A. 595. The Company has sought to rely in this Court on the provisions of Par. 29 (a) of Sec. 6 of the Charter of the City empowering the City to close streets and to award and pay damages therefor. The Company's pleading on which this case reaches this Court is designated as the second amended complaint, but we note that it does not assert any claim based upon those provisions of the Charter, though it does allege the condemnation and closing of streets and alleys under the two ordinances above referred to. There is nothing in the record to show whether the Company was or was not a party to the street closing proceedings. We take it that the City seeks a determination of the rights and liabilities of the parties under Ordinance No. 718, and we find it unnecessary to decide whether the Company should have asserted a claim in the street closing proceedings or whether it could have maintained such a claim under Par. 29 (a).

In view of the recent extensive review in Judge Hammond's opinion in the *Harbor Tunnel* case of authorities dealing with the question as to whether or not a public utility is entitled to reimbursement for such expenses as those here involved, we think that no general review of such authorities would be helpful at this time. *First National Bank of Boston v. Maine Turnpike Authority,* 136 A. 2d 699 (Me.), decided October 21, 1957, contains no holding which we deem inconsistent with the views stated in the *Harbor Tunnel* case or in this case. There, the Supreme Judicial Court of Maine found that the

original act under which Turnpike Authority bonds were issued did not provide for payment of utility relocation costs, and that under the usual rule, the Authority was therefore under no obligation to pay for such expenses. A subsequent amendment provided expressly that the Authority should pay for them. This was held invalid as an impairment of the obligation of contract. No question of the impairment of a contract is here involved. But for that objection it appears to us that the Maine Court would have applied the same rule which we applied in the *Harbor Tunnel* case—that even though there was no constitutional requirement· for the payment of such costs, a legislative provision for their payment would be given effect.

Here we find the legislative intention expressed in the Ordinance that the City should make such payments and for the reasons already stated we find that the applicable constitutional and statutory provisions authorized the provisions of the Ordinance for the making of such payments.

The City points out that the provisions of Ordinance No. 718 for payment out of funds available to the Commission are conditioned upon approval by the Board of Estimates and contends that they are expressed only in permissive terms. Neither objection is strongly pressed, nor do we find either objection persuasive. We do not suppose that the Board of Estimates would, if it could, withhold approval of the expenditure of funds available to the Commission (now the Baltimore Urban Renewal and Housing Agency) for purposes authorized by the Ordinance, merely at its own whim or for any capricious reason; and no reason for withholding approval has been suggested other than the dispute as to liability presented by this case. On the contrary, the parties are in agreement as to the propriety of the amount claimed, if the City has any liability. Cf. *City of Baltimore v. DeLuca-Davis Const. Co.*, 210 Md. 518, 535-536, 124 A. 2d 557. Insofar as the words "may expend" are concerned, they should, we think, be construed as mandatory and as requiring that payments be made when the Commission determines to go ahead, and does go ahead, with a project calling for the expenditure of funds for purposes authorized by the Ordinance.

See *State v. Knowles,* 90 Md. 646, 654-655, 45 A. 877; *Board of Election Supervisors v. Welsh,* 179 Md. 270, 274-275, 18 A. 2d 202. See also *Sifford v. Morrison,* 63 Md. 14; *City of Baltimore v. Marriott,* 9 Md. 160, 174.

In view of the conclusions above stated, we find it unnecessary to consider the question of liability of the City on the ground asserted by the Company that the City was engaged in a proprietary and not a governmental undertaking in the redevelopment of the area here involved.

No objection has been made to the order on the ground that enforcement of the liability found to exist on the part of the City should be limited to funds available to the Commission or its successor.

As we construe the provisions of Article XI-B of the State Constitution and the provisions of the statute and ordinance here involved, we think the *Harbor Tunnel* case is controlling, and that the Company is entitled to recover the costs above stated. The order appealed from will accordingly be affirmed.

*Order affirmed, with costs.*