# MAYOR AND CITY COUNCIL OF BALTIMORE ET AL. *v.* BALTIMORE GAS AND ELECTRIC COMPANY ET AL.

[Nos. 297-353, September Term, 1962.]

124

*Decided June 26, 1963.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, HORNEY and MARBURY, JJ.

*Bernard J. Sachs, Assistant City Solicitor,* with whom was *Francis B. Burch, City Solicitor,* on the brief, for M. & C. C. of Baltimore, part of appellants.

*Evan A. Chriss,* with whom was *Eugene M. Feinblatt* on the brief, for Housing Authority of Baltimore City, other appellant.

*Paul S. Clarkson* and *Richard F. Ober,* with whom was *William Baxter* on the brief, for appellee.

HAMMOND, J., delivered the opinion of the Court.

These appeals present for decision whether the Baltimore Gas and Electric Company must pay for the relocation of its utility facilities, occasioned by the closing of streets by the Mayor and City Council of Baltimore for the building of a market, nine schools and a housing project and the improvement of Greenspring Avenue, or whether the City (or the Housing Authority of Baltimore in the case of the housing project) must stand the cost.

Three forms of ordinance are involved. One, referred to as the "old form" street closing ordinance, provides that no structures shall be built on the former street after it has been closed until subsurface structures or appurtenances shall have been abandoned or removed and relaid "* * * under the direction of the Highways Engineer of Baltimore City, and at the expense of the person or persons or body corporate desiring

to erect such building or structure." The necessities for the closing of the streets closed under this form of ordinance were the building of a new Lafayette Market (a proprietary exercise of power) and four schools (governmental exercises of power), and the widening and straightening of a part of Greenspring Avenue (also a governmental exercise).

A second form of ordinance referred to as the "new form," under which streets used for the construction of five schools were closed, provides explicitly that subsurface structures owned by others than the City shall be removed, upon the closing of the street, at the expense of the owner of the subsurface structure.

The third form of ordinance under which were closed streets and alleys for the construction of a housing project (which the City and the Housing Authority say is a governmental function and the utility says is a proprietary exercise) is simply silent as to expenses in connection with removal or abandonment of subsurface structures owned by others than the Mayor and City Council of Baltimore.

The City says (a) that the common law rule is that a public utility must relocate its facilities in or under a street at its own expense if required by public necessity, security, convenience or welfare without regard to whether the requirement is a governmental or proprietary purpose, unless the legislative body has expressly directed otherwise; (b) that neither the old form ordinance nor any other ordinance or statute has directed otherwise; and (c) that there was no taking of private property in a constitutional sense which required payment of compensation.

The utility says (a) the common law rule is limited to removals and relocations necessitated by an improvement or extension of the road system only, and none of the closings here involved is in this category; (b) even if the common law rule is as broad as the City says it is, (1) the language of the old form ordinances amounts to a legislative direction that the common law rule shall not apply, in that the City is a "person" or a "body corporate" required by the ordinance to pay the cost of removing subsurface structures under any building it erects on a closed street, and (2) the common law rule does

not apply where a proprietary rather than a governmental purpose occasions the moving of utility facilities; and (c) that all the street closings constituted takings of property in the constitutional sense requiring compensation, rather than being mere non-compensable regulations.

Judge Foster held for the utility in all twelve instances. The essential basis for his holding was his construction of the opening sentence of the opinion of this Court in *Baltimore Gas and Electric Company v. State Roads Commission,* 214 Md. 266 (the Harbor Tunnel case) that "[u]nless the Legislature directs to the contrary, the rule is that a public utility must, at its own expense, remove and relocate its service facilities in, on or under a public road or other land owned by the State if this is made necessary by improvement or extension of the road system." He read this as a holding that a utility need not pay for a relocation of its facilities in, on or under a public road or other land owned by the State which is made necessary by any public purpose other than highway improvement or extension.

The *Harbor Tunnel* case did not hold this. The case dealt only with highway improvements and extensions, and the sentence relied on by Judge Foster stated the rule in the terms applicable to the facts and the problem then before the Court. That problem, and the question to be decided, was whether the language used in the statute under which the tunnel and its approaches were built as a toll revenue project meant that the Legislature had abrogated the common law rule which otherwise would have controlled, and the holding was that it had.

The opinion did not hold or say that the rule is limited to situations of highway changes, and it is not so limited. It is applicable whenever the public safety, security, convenience or welfare require the utility to incur expense in moving its facilities in, on or under public land. Most of the cases in which the rule has been applied have dealt with highway improvement or extensions, but there are many cases reaching the same result in which other public projects have required the utility to accommodate progress, or at least change, at its expense, in the general public interest.

In a foundation case, *New Orleans Gaslight Co. v. Drainage Commission,* 197 U. S. 453, 49 L. Ed. 831, 835, the project

which compelled the utility to raise and relocate its mains in the streets was a system for draining the entire city of New Orleans. The Supreme Court held that the company could constitutionally be required to bear the cost of changing the grade and position of its mains, and that when the gas company installed its pipes "it was at the risk that they might be, at some future time, disturbed, when the state might require for a necessary public use that changes in location be made. * * * In the exercise of the police power of the state, for a purpose highly necessary in the promotion of the public health, it has become necessary to change the location of the pipes of the gas company so as to accommodate them to the new public work. In complying with this requirement at its own expense, none of the property of the gas company has been taken, and the injury sustained is *damnum absque injuria*."

In *Chicago, B. & Q. R. Co. v. Illinois,* 200 U. S. 561, 50 L. Ed. 596, the project was, in the words of the opinion, the "draining of this large body of lands so as to make them fit for human habitation and cultivation * * *." In order to accomplish this public purpose it was necessary to widen and dredge a creek so it would drain swamps. This required the railroad company to relocate a bridge over the creek. It was held that it could constitutionally be required to do so at its own expense under the police power of the State to regulate franchise holders.

Gas pipes in the bed of a stream were ordered moved at the expense of the utility in order to permit dredging operations in *New York v. Brooklyn Borough Gas Co.,* 105 N. Y. S. 2d 459, 471. The Court said this was permissible "because the right of the defendant to exercise its franchise is inherently subject to reasonable regulation and control when the public safety and convenience requires." In *Los Angeles County F. C. District v. Southern Cal. Ed. Co.* (Cal.), 333 P. 2d 1, the officials of the Flood Control District which drained the entire City made the utilities relocate their facilities to accommodate large storm drains. The Supreme Court of California held that the building of the drainage project was an exercise of the police power in aid of a public purpose and that a utility must bear the cost of relocating its facilities "when necessary to make way for a proper governmental use of the streets," in the lan-

guage of *Southern Cal. Gas Company v. Los Angeles* (Cal.), 329 P. 2d 289, 290, which had held a sanitary sewer project to be a governmental function which could compel a utility to relocate its facilities at its expense, rather than a proprietary function which would require the City to pay the moving costs. See also *Anderson v. Fuller* (Fla.), 41 So. 684.

A well reasoned opinion, soundly buttressed by authority, held in *City of Macon v. Southern Bell Telephone and Telegraph Co.* (Ga.), 79 S. E. 2d 265, that the closing of a street and the moving of utility facilities therein at the utility's expense, in order to construct a hospital, came within the general rule that there was no taking of property and was no more than non-compensable regulation in the interest of the public good, health and welfare.

The general rule was applied by the Supreme Judicial Court of Massachusetts where streets were closed for the building of a railroad terminal in *New England Telephone and Telegraph Co. v. Boston Terminal Co.*, 65 N. E. 835. See also *Northern Indiana Gas & Electric Co. v. Merchants' Imp. Ass'n* (Ind.), 160 N. E. 50.

12 *McQuillin, Municipal Corporations,* 3rd Ed., Sec. 34.72, p. 241, points out that requiring the utility to pay for relocation of facilities in cases of improvement and extension of the highway system is "merely an application of the rule that the grant of a franchise is subject to any proper exercise of the police power."

The opinion in the *Harbor Tunnel* case (at pp. 275-276 of 214 Md.) noted that the case of *New York Tunnel Authority v. Consolidated Edison Co.* (N. Y.), 68 N. E. 2d 445, had held that the general rule is that public utility corporations are bound to relocate their facilities at their expense "whenever public interest requires * * *." The *Tunnel Authority* case (at p. 448 of 68 N. E. 2d), in recognizing the "fundamental common-law right applicable to franchises in streets" adopted the holding of *Transit Com. v. Long Island R. Co.* (N. Y.), 171 N. E. 565, 566-567, as follows:

> "Although authorized to lay its pipes in the public streets, the company takes the risk of their location and is bound to make such changes as the public security and convenience require, at its own cost and

charge [citing cases, including the New Orleans and
Illinois drainage project cases]. All these cases are
to the point, that these public service corporations
maintain their rights in the streets, subject to reason-
able regulation and control, and are bound to relocate
their structures at their own expense whenever the
public health, safety or convenience requires the
change to be made."

The rule was stated in the broad form in *Kirby v. Citizens
Railway,* 48 Md. 168, 170, in which the Railway Company, the
tracks of which were in the street, sought unsuccessfully to
prevent the City from temporarily closing the street in order
to install a sewer under it. The Court said: "* * * the appel-
lee knew or was bound to know, that its use of the bed of the
street for railway purposes, was liable at any time to be inter-
fered with, whenever the City authorities might deem it neces-
sary for the public welfare."

It is clear to us that the utility must bear the cost of re-
locating its facilities in and under streets which were closed for
the furtherance of projects which are governmental, rather
than proprietary, in nature unless (a) there is a taking of the
utility's property in the constitutional sense or (b) there is an
applicable legislative direction that the usual rule is not to ap-
ply and the City or the Housing Authority must pay. The
building of the schools and the improving of Greenspring Ave-
nue unquestionably were exercises of governmental functions.
We think that the closing of the streets for the building of the
housing project by the Housing Authority of Baltimore City
is also in the same classification. Various provisions of Code
(1957), Art. 44A, "Housing Authorities," so indicate. Sec. 2
says that the conditions which Housing Authorities were cre-
ated to reduce or eliminate "constitute a menace to health, safety,
morals and welfare of the residents of the State." Sec. 8 says
"an authority shall constitute a public body corporate and po-
litic, exercising public and *essential governmental functions*
* * *." (Emphasis supplied.) Sec. 9 provides that projects
shall not be operated for profit. In *Baltimore v. State,* 173 Md.
267, 276, and *Harford County v. Love,* 173 Md. 429, 431, the

tests for determining whether a function of a governmental entity is governmental or proprietary were stated as follows:

> "Where the act in question is sanctioned by legislative authority, is solely for the public benefit, with no profit or emolument inuring to the municipality, and tends to benefit the public health and promote the welfare of the whole public, and has in it no element of private interest, it is governmental in its nature."

The Housing Authority and the housing project are specifically authorized by the Legislature, are solely for the public benefit (*Matthaei v. Housing Authority*, 177 Md. 506, 515), are not operated for profit or as a source of revenue, have no element of private interest and are to promote the public health, welfare and morals.

It has been generally held that housing projects are governmental. *Matthaei v. Housing Authority, supra; Richards v. Columbia* (S. C.), 88 S. E. 2d 683; *Miller v. City of Louisville* (Ky.), 321 S. W. 2d 237; *Housing Authority of Gallatin County v. Church of God (Ill.)*, 81 N. E. 2d 500, 504; *7 McQuillin, Municipal Corporations*, Sec. 24:563. *Cf. Chicago, B. & Q. R. Co. v. Illinois, supra.*

We turn to consideration of whether there was a taking. The utility makes no claim here for loss of or damage to any franchise or easement. Its claim essentially is for the cost of moving its facilities which were placed in the bed of public ways in the exercise of its franchise. The privilege of the utility to continue to maintain a facility in a particular street ended when that street was lawfully closed, but it had the right to enter and remove the facility and the right to locate it in another street or other streets in the further and continued exercise of its franchise.

There was no physical encroachment on or invasion of property of the utility and no such impairment or interference with property rights as to make them useless. Accordingly, there was not a taking, only an indirect or consequential injury which does not give a constitutional right to compensation. Cases cited earlier show this to be the general rule, and the *Harbor Tunnel* case establishes it beyond question as the Maryland rule in

the situations under review. We said in that case (pp. 278-279 of 214 Md.) :

"* * * the bedrock basis for the police power to require the moving of utility facilities without paying compensation, is that the State does not take property within the meaning of the Constitution and, therefore, is not required to pay. Because it has not taken the property, the damage to the owner is consequential or incidental, just as is the damage to one abutting a newly built or improved road or bridge whose property is not taken but merely damaged. In both cases the common law rule has been that the loss to the owner was *damnum absque injuria.*"

and then said (p. 281) :

"The Company makes no claim for loss of, or damage to, any franchise or easement. It says that its rights of ownership in relation to the tangible service facilities were damaged and destroyed. These rights included the right to use the facilities to afford service to its customers and the public and to the consequent revenues produced. Because the exercise of the police power by the Commission compelled a cessation of the use of the facilities until they were moved or new facilities substituted for them, the greater part or all of their value to the owner—its property rights in relation to them—was damaged or destroyed. Ordinarily, in this situation, the Company could demand no recompense for the expense it was put to by the State because, in the eyes of the law, it still had its franchise and it still had the tangible personal property and, so, there had been no taking which required compensation."

There was no taking.

We come to whether the Legislature has changed the common law rule in any of the situations confronting us. The general provisions of law for the closing of streets in Baltimore have not changed the rule.

The Charter and Public Local Laws of Baltimore City (1949 Ed.), Sec. 6, Subsection 29, gives the City full power to close streets and to collect benefits and award damages resulting therefrom. The Baltimore City Code (1950 Ed.), Art. 35, Sec. 2, provides that when the City closes a street, the Department of Assessments shall ascertain what damage has occurred to the owner of any right or interest for which the owner "ought to be compensated."

In *German Lutheran Church v. Baltimore,* 123 Md. 142, this Court, construing Charter and Code language substantially the same as that now applicable, held that the proceedings for the closing of a street are condemnation proceedings and that the damages required to be paid are only such as the Constitution requires to be paid and not incidental or consequential damages to property not actually taken.

We have not been referred to, or found, any other statute or ordinance presently applicable which changes the rule.

The new form ordinance under which streets were closed to build five schools not only does not direct the City to pay for removals or relocations of subsurface structures, but expressly provides that such structures not owned by the City shall be removed at the expense of the owners.

The ordinance under which the streets to be used in the building of the housing project were closed does not direct or require the City to pay utility facilities relocation costs, being silent on the subject, so that, as far as that ordinance is concerned, the common law rule, that the utility must pay, is unaffected. Sec. 6, subsection 14A, of the Charter gives the City broad powers as to land development and redevelopment. The ordinance before this Court in *Baltimore City v. Baltimore Gas Co.,* 221 Md. 94, which was construed as directing the City to pay for the cost of moving utility facilities, was passed to exercise the powers given the City by subsection 14A of Sec. 6 of the Charter. The provisions of the Charter there pertinent are not pertinent here. The ordinance under which the streets and alleys were closed for the housing project was not passed in exercise of powers conferred by subsection 14A of Sec. 6 of the Charter, and the slum dwellings were cleared and the new dwellings erected not by the City but by the Housing Authority under powers conferred by Code (1957), Art. 44A.

Judge Foster, without specificity, said that the provisions of Art. 44A were broad enough to require the Housing Authority, under its indemnity agreement with the City, to reimburse it for all costs and expenses incurred in performing its preliminary function of closing streets and alleys in furtherance of the housing project and broad enough to impose an independent liability on the Authority. We find no provision in Art. 44A which goes beyond similar provisions in many statutes authorizing the acquisition of real and personal property in connection with public improvements, and such provisions have been construed not to require the payment of damages or compensation unless there has been a taking. See, for example, *Langley v. State Roads Commission,* 213 Md. 230 (construing Code (1951), Art. 89B, Sec. 7).

The old form ordinance presents a closer question. Read literally, and out of context, the words in Sec. 3 thereof that no buildings shall be constructed on the closed highway until subsurface structures "shall have been abandoned or shall have been removed and relaid * * * at the expense of the person or persons or body corporate desiring to erect such buildings * * *" would include the City, which is the entity that built the structures, the schools and the market, in the closed portion of the highways. We think, however, that read in context the quoted language was not intended to, and does not, include the City. The presumption is that the legislative body did not intend to change the common law further than the situation dealt with required or, stated conversely, that no alteration of the common law other than that specified and plainly pronounced was meant. *Lutz v. State,* 167 Md. 12, and cases cited. The shorthand for these propositions is the canon of construction that a statute in derogation of the common law is to be strictly construed. *Stoll v. Mayor and City Council,* 163 Md. 282, 293; *City of Baltimore v. Harvey,* 118 Md. 275, 283.

The State and its creature, a municipal corporation, generally are not included within the class meant by the words person, corporation or body corporate in a statute, although they may be. *Phillips v. Baltimore City,* 110 Md. 431; *State v. Ambrose,* 191 Md. 353, 365. The cases and the controlling principles were well analyzed and explored by Judge Watkins

of the United States District Court for the District of Maryland in *United States v. Coumantaros,* 165 F. Supp. 695. He pointed out that the general rule of construction excluding the sovereign—Federal, State, and agencies of both—from the purview of a statute in terms applicable to a person or corporation "finds its basis in no small part in the doctrine of governmental immunity." *Ohio v. Helvering,* 292 U. S. 360, 368-369, 78 L. Ed. 1307. As a natural and logical consequence, he pointed out that "the general exclusionary rule has no application where no impairment of sovereign powers will result, where immunity has been waived or where the government is given, rather than deprived of, powers." In the ordinance under consideration the City would suffer impairment of a sovereign right to be free of liability and would be deprived of power if it were included as a person or body corporate within the meaning of the ordinance.

More significantly, intrinsic evidence that the City was not to be so included is offered by the terms of the ordinance itself. When the City is intended to be referred to, it is described as "the Mayor and City Council of Baltimore." It is so referred to four times in the fifteen printed lines of Sec. 2 of the ordinance. That section says that if "any person, firm or corporation" shall desire to remove any subsurface structure in a closed highway "owned by the Mayor and City Council of Baltimore," such person, firm or corporation shall obtain permission and permits from "the Mayor and City Council of Baltimore" and shall agree to pay all costs and charges of every kind "made necessary by such removal."

It is obvious that the phrase "person, firm or corporation" in Sec. 2 of the ordinance does not include the City, and we think only an impermissible strained construction would allow the similar phrase in Sec. 3 ("person or persons or body corporate"), the words of which have meanings identical with those in the phrase in Sec. 2, to be construed differently so as to include the City. Sec. 3 requires "the person or persons or body corporate desiring to erect such buildings * * *" to remove and relay subsurface structures "in accordance with the specifications and under the direction of the Highways Engineer of Baltimore City." Sec. 67 (i) of the Charter provides

that the cost of removing utility facilities to permit the progress of work of any bureau of the Department of Public Works shall be at the expense of the owner of such facilities unless there is "a taking in the constitutional sense" of the franchise involved, in which case there shall be a condemnation of the franchise. All of the projects for which streets were closed under the old form ordinance were performed and finished under the supervision and control of the Bureau of Public Works (a bureau of the Department of Public Works) pursuant to the directions of Sec. 68 of the Charter. It is scarcely to be inferred that Sec. 3 of the ordinance means the Bureau of Public Works of the City is to seek the specifications and direction of the Highways Engineer to remove subsurface structures as a preliminary to erecting a building.

We do not believe the common law rule was changed by the old form ordinance.

There remains the question of whether the general rule applies where the relocation of the utility facilities is made necessary by a proprietary purpose. It is agreed by the parties that the building and maintenance of a market by a municipality is a proprietary exercise of power. (*Cf. Reed v. Baltimore,* 171 Md. 115.)

The Courts have held generally that a proprietary exercise of power which requires the moving of utility facilities from public ways or lands puts the sovereign or its creature in competition with, or on an equal basis with, the utility; and, therefore, the State, or its agency, may not exercise its usual superior governmental right to regulate franchises without cost to itself. See *State v. Carney* (Ohio), 126 N. E. 2d 449, 460, in which the claim was made that proceeds of a bond issue to build a municipally owned subway (a proprietary function in Ohio) could not be used to pay for relocation of utility facilities because the common law rule was that the owner of the facility had to pay the moving costs. The Court said:

"* * * the county, acting in a proprietary capacity, must assume and pay whatever damage, if any, is done thereby to other property in the process of such construction * * *.

"The general rule recognized by the courts throughout the country is that in the absence of contract to that effect there is no power in a governmental subdivision to require public utilities using public streets to relocate their facilities at their own expense to accommodate the proprietary utility operations of such subdivision. A governmental subdivision in the exercise of its proprietary functions is in the same position as a private utility attempting to force such relocation."

See also *In re Gillen Place, Borough of Brooklyn, Etc.* (N. Y.), 106 N. E. 2d 897 (relocation to build municipal bus garage); *City of Los Angeles v. Los Angeles Gas and Electric Corp.,* 251 U. S. 32, 64 L. Ed. 121 (relocation in aid of municipal lighting system); *City of Garland v. Texas P. & L. Co.* (Tex. Ct. Civ. App.), 342 S. W. 2d 816 (City could not deny utility rights in streets in aid of its municipal power system); *Multnomah County v. Rockwood Water District* (Ore.), 347 P. 2d 110.

It is stipulated that the utility's costs arising from the closing of streets for the Lafayette Market were $6,630. We find that the City must pay these costs. All other costs to the utility occasioned by the closing of streets must be borne by the utility.

> *Order of Superior Court of Baltimore City dated August 29, 1962, requiring the Mayor and City Council of Baltimore to pay the Baltimore Gas and Electric Company $6,630, affirmed.*
>
> *Order of Baltimore City Court dated January 22, 1963, requiring the Mayor and City Council of Baltimore to pay the Baltimore Gas and Electric Company $28,357 and the City or the*

*Housing Authority to pay the Gas Company $9,718, reversed.*

*Baltimore Gas and Electric Company shall pay six-sevenths of the costs and the Mayor and City Council of Baltimore one-seventh.*