856 A.2d 660

**POTOMAC ELECTRIC POWER COMPANY, et al.**

v.

**CLASSIC COMMUNITY CORPORATION.**

**No. 101, Sept. Term, 2003.**

Court of Appeals of Maryland.

Aug. 23, 2004.

Heather Libman Blauer (Mark A. Gilday, Bregman, Berbert, Schwartz & Gilday, LLC, Bethesda, Jeffrey A. Friedman, Ned S. Kodeck, Chtd., Baltimore, on brief), for appellants.

John A. Rego (Anderson & Quinn, LLC, Rockville, on brief), for appellants.

Patrick C. McKeever (Michael G. Campbell, Miller, Miller & Canby, Rockville, on brief), for appellee.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, GREENE and JOHN C. ELDRIDGE (Retired, Specially Assigned), JJ.

WILNER, J.

For about 70 years, Potomac Electric Power Co. (PEPCO) has maintained utility poles along the side of Travilah Road in Montgomery County, on land now owned by Classic Community Corporation (Classic).[1] The poles carry electric lines owned by PEPCO and, through agreements with PEPCO, telephone

---

1. Classic proceeded through a number of corporations or limited liability companies. For convenience, we shall use the name "Classic" as applying to any or all of them.

lines owned by Verizon Maryland, Inc. (Verizon) and cable lines owned by Comcast of Maryland, Inc. (Comcast).

Classic, a developer, purchased the property, consisting of about thirty acres, in January, 1998, after receiving preliminary approval from the Maryland–National Capital Park and Planning Commission for a proposed 91–unit residential development. In February, 1998, Classic recorded subdivision plats in which it dedicated to public use the portion of the property on which the poles were located. It so dedicated that part of the property because the Public Improvements Agreement that it signed with Montgomery County required that Classic widen Travilah Road and construct a shoulder to the road, an adjacent drainage ditch, and sidewalks. For that work to be done and for Classic's residential development to proceed, the poles must be moved. In addition to that strip of land dedicated to public use for the road, drainage, and sidewalk improvements, the plat showed a public utility easement of between 10 and 16 feet through another part of the property. The plat stated that the easement was dedicated pursuant to a separately recorded Declaration of Public Utility Easements that is not in the record before us and that has remained unmentioned by the parties. The Declaration, of which we may take judicial notice, makes clear that the easement is for the benefit of PEPCO, to allow it to bury the electric lines, instead of having them continue to run overhead.

Both the Public Improvement Agreements with the county and the construction permit issued by the county required Classic to move the poles.[2] Classic filed a road plan showing the removal of the poles—a document that also is not in the record before us—but then insisted that PEPCO do the

---

2. The Public Improvement Agreements stated that "DEVELOPER shall insure final and proper completion and installation of all utility lines underground." One of the express conditions attached to the construction permit issued by the county was that "[t]he relocation and/or adjustment of any public or private utility, prior to any construction authorized by this permit, shall be the responsibility of the permittee." The application for the permit, which became part of the permit, required Classic to "[c]oordinate the relocation of the utility poles with the appropriate utility companies."

removal and relocation at its expense. When PEPCO refused, Classic filed this action against PEPCO, Verizon, and Comcast in the Circuit Court for Montgomery County, seeking a declaratory judgment that PEPCO had no easement or other interest in the property, that it therefore had no right to maintain the poles in their current location or to give Verizon or Comcast permission to string their lines from those poles, that PEPCO must remove the poles and relocate them at its expense, and that Verizon and Comcast must remove their wires from the poles.

On December 19, 2002, the court entered a declaratory judgment that essentially adopted Classic's arguments. The judgment declared that PEPCO did not possess any easement or other interest in the land that would permit it to maintain its poles there, that it had no right to grant permission to Verizon or Comcast to string their lines on those poles, that PEPCO must remove the poles from Classic's property and relocate them at its expense, and that Verizon and Comcast must remove their lines from the poles pending any future agreement.[3] The utilities filed timely appeals, and we granted *certiorari* prior to proceedings in the Court of Special Appeals. Although each of the Circuit Court's findings is challenged, it seems clear that the lines and poles will have to be removed at some point, if they have not already been removed, and, as noted, the real issue is who ultimately will bear the cost of that operation. We shall conclude that the cost of removing the lines and the poles must fall on Classic and that the Circuit Court erred in determining otherwise.

---

3. The parties speak of "relocating" the poles. As noted, because it seems clear that the lines will be buried in conformance with the Declaration of Public Utility Easements, it does not appear that the poles will actually be relocated elsewhere on the property, but simply removed. The issue is which party will bear the cost of removing the lines and the poles from their current location. Whether the parties are also disputing who will bear the cost of burying the lines is not clear. The pleadings, the court's judgment, and the briefs in this appeal all seem to focus only on removing the lines and poles, and we shall limit our review to just that issue.

## BACKGROUND

Pursuant to a number of franchises, PEPCO has been supplying electricity to customers in various parts of Maryland, through lines located on or adjacent to public roads, since approximately 1909. *See Potomac Elec. Power Co. v. Birkett,* 217 Md. 476, 478–79, 143 A.2d 485, 487 (1958). In March, 1931, PEPCO, in consideration of one dollar, acquired from John H. Hunter, the then-owner of the property at issue, a right-of-way card that granted to PEPCO, and its successors and assigns,

"the right to construct, operate and maintain lines for the transmission and distribution of electricity, including the necessary poles, cables, wires, and fixtures upon the property owned by me or in which I have any interest, situated in Montgomery County, State of Md., and more particularly described as Travilah Road, Travilah, Md. and upon and along such roads, streets or highways adjoining the said property; and to make such extensions therefrom as are necessary to distribute electric service; to permit the attachment of the wires of any other company or person; to trim any trees along said lines so as to prevent injury thereto and to keep a reasonable clearance around the wires, with the further right to remove all trees that interfere with, or which in falling might damage said lines; to erect and set the necessary guy and brace poles and anchors and to attach thereto and to trees the necessary guy wires.

# 612311 to 15 incl.therein

This permission is granted on condition that the work be done with care, and that all damage to the premises caused thereby shall be repaired at the expense and under the supervision of the Potomac Electric Power Company."

It would appear that the numbers noted in the right-of-way agreement—"612311 to 15"—referred to the pole numbers, thus indicating an acknowledgment that at least five poles (Nos. 612311 through 612315) would be erected. At some point, Carlton Mills acquired the Hunter property. The deed

from Hunter to Mills is not in the record. In June 1942, PEPCO acquired a new permission from Mills. The agreement gave to PEPCO, its successors and assigns, general permission to install, replace, relocate, and maintain poles and overhead electric wires on the premises and to make such extensions therefrom as necessary to distribute electric service from time to time. The card noted, by interlineation, "install pole 628817, replace + relocate pole 612309 N.O.T.T." [4]

Shortly after erection of the poles, the Chesapeake & Potomac Telephone Company, a predecessor to Verizon, installed its telephone lines on the poles. Pursuant to joint use agreements signed from time to time between PEPCO and the telephone company, those lines have been continuously maintained on the poles since that time. Pursuant to an Overhead Attachment Agreement with PEPCO, Comcast strung and has maintained its cable television lines on the poles since 1987. It is conceded that neither the telephone company nor Comcast ever sought or received express permission from the landowner to attach its wires to the poles; their authority came solely from PEPCO.

## DISCUSSION

As we have observed, in light of the fact that, as part of the proposed residential development, Travilah Road will be widened and sidewalks and drainage improvements will be install-

---

4. There is no explanation in the record of why PEPCO thought it necessary to obtain this additional permission. Nor is there any explanation of the interlineation or its significance. It is worth noting that the agreement obtained from Hunter referenced only five poles (Nos. 612311 through 612315). It would appear that, by June, 1942, PEPCO had at least one other pole on the property as well, as the Mills agreement notes the relocation of pole 612309. The parties agreed at the summary judgment hearing that there are currently nine poles on Classic's property. The 1998 plats filed by Classic's predecessor in title show pole numbers that are entirely different from the numbers shown on the 1931 and 1942 right-of-way agreements, and there is nothing in the record to match the numbers. Those two agreements account for seven poles (Nos. 612309, 612311 through 612315, and 628817) and, by inference, an eighth pole (No. 612310).

ed, the poles will, at some point, have to be moved. The ultimate relevant issue between the parties, therefore, is not whether the poles can remain where they are but whether PEPCO or Classic ultimately will bear the cost of the removal.

Unfortunately, the parties address the financial responsibility issue in terms of whether PEPCO has a right to maintain the poles in their current location. PEPCO claims that it has an express easement, based on the agreements it obtained from Hunter and Mills, to maintain the poles where they are and that if Classic wants the poles moved for its own purposes, it will have to bear the cost of removal. Verizon and Comcast also claim an easement with respect to their wires, either expressly through the agreements obtained by PEPCO or, in the case of Verizon, by prescription. Even if, as urged by Classic, the agreements obtained from Hunter and Mills do not constitute easements but are mere licenses that ended with the death of the licensors and were in any event revoked by Classic, PEPCO claims (1) a right under its franchise to maintain the poles in what is now a public right-of-way, and (2) that, by virtue of the tariff approved by the Public Service Commission, Classic is required to pay for removal of the poles. Verizon and Comcast adopt those arguments as well.

The Circuit Court concluded that the agreements obtained from Messrs. Hunter and Mills did not constitute express easements but were merely licenses. Although that conclusion rested in part on the wording of the agreements— particularly the 1942 agreement—the court found telling PEPCO's perceived need to obtain a new permission from Mills. It observed:

"The fact that PEPCO had Mr. Mills sign a 'right of way card' when he purchased the property from Mr. Hunter in 1942 speaks volumes as to how PEPCO viewed the 1931 card. Had PEPCO believed that the 1931 card created an easement, there would have been no reason for PEPCO to establish a relationship with the new property owner. Seeking Mr. Mills' signature for the 1942 'right of way card' indicates that PEPCO was cognizant of the notion that they only had the privilege of placing utility poles on the proper-

ty and would need the approval of the new owner to continue this privilege."

Having so found, the court concluded that, armed only with a license, PEPCO had no further right to maintain its poles on Classic's land. Although it noted that, because the poles were now situated on land dedicated to public use, Classic was not seeking an ouster of the poles, the court held that PEPCO must bear the cost of relocation. Notwithstanding that in its post-trial memorandum PEPCO expressly argued that, by virtue of its legislatively-conferred franchise and the tariff approved by the Public Service Commission, the cost of any required location must be borne by Classic, the court declared that PEPCO chose to base its use of Classic's land solely on the right-of-way cards and therefore never addressed PEP-CO's franchise and tariff arguments. Based solely on its finding that there was no easement, the court found that PEPCO was responsible for the cost of relocation.

 There are a number of problems with the court's analysis and ruling. It is not at all clear to us that the 1931 agreement obtained from Mr. Hunter did not constitute an easement[5] or that, even if PEPCO had only a license, it would

---

5. If an easement was created, it would have been created by the 1931 right-of-way agreement obtained from Mr. Hunter and would have been an easement by express grant. In *Kobrine v. Metzger*, 380 Md. 620, 636, 846 A.2d 403, 412 (2004), quoting from *Brehm v. Richards*, 152 Md. 126, 132, 136 A. 618, 620 (1927), we confirmed that, to constitute the grant of an easement, the instrument must contain the "names of the grantor and grantee, a description of the property sufficient to identify it with reasonable certainty, and the interest or estate intended to be granted." Citing *Dubrowin v. Schremp*, 248 Md. 166, 171, 235 A.2d 722, 724–25 (1967), we observed further that "a right of way, otherwise sufficiently described, could validly be created by a memorandum that complied with the Statute of Frauds, *i.e.*, a writing signed by the party to be charged or that party's authorized agent." The 1931 right-of-way agreement from Mr. Hunter would seem to comply with those minimal requirements. It is in writing; it contains the names of the grantor and the grantee, describes the property sufficiently to permit its identification, and states the interest intended to be granted; it is signed by Hunter; it "grant[s]" the "right" to construct and maintain poles and lines; and it makes that "grant" to PEPCO and its successors and assigns.

be required to remove the poles upon expiration of the license.[6] We need not address those questions, however. The

---

In finding no easement, the Circuit Court placed great weight on the fact that PEPCO returned in 1942 to obtain a supplemental agreement from Mills—an action the court found indicative of PEPCO's understanding that it did not then have an easement. Given the fact that the record is silent as to why PEPCO thought it necessary or desirable to obtain a supplemental agreement from Mills, such an inference is, to some extent, speculative. If an inference as to intent or understanding is to be drawn, one that may be at least equally compelling is that the parties intended that the 1931 agreement constitute something more than a mere license—that PEPCO would not have gone to the expense of erecting poles and stringing lines as part of an overall electrical distribution system based on a license that Hunter or any successor could revoke on a moment's notice. There are, to be sure, cases in which a document that the parties believed to be an easement for utility lines turned out later not to satisfy the legal requisites of an easement and for that reason was held to be a license (*see*, for example, *Baltimore v. Brack*, 175 Md. 615, 3 A.2d 471 (1939) and *Nelson v. American Telephone & Telegraph Co.*, 270 Mass. 471, 170 N.E. 416 (1930)), but, to the extent that the nature of the right given is to be determined by the intent of the parties rather than conformance with a particular legal requisite, the court must give some weight to whether it would be reasonable to assume an intent to confer a mere license when both parties knew that the sole function of the right-of-way was to permit the erection, at considerable expense, of relatively permanent structures for public utility purposes.

6. There appear to be two distinct lines of authority on whether a licensee, upon expiration of the license, is obliged to restore the land to the condition it was in at the time the license was granted, *i.e.*, to remove any improvements erected by the licensee pursuant to the license. One line of authority rests on property law and, as the Court of Special Appeals correctly concluded in *North Amber v. Haut*, 101 Md.App. 452, 463, 647 A.2d 127, 132 (1994), is to the effect that "a licensee is not responsible for removing improvements or fixtures made or installed during the term of the license." The court held in that case that a licensee which, pursuant to the license, had constructed a drainage pond on adjoining land, was not required to reconfigure the pond entirely on its own property when the license was revoked. Among other authorities cited for the proposition were 1A George W. Thompson, COMMENTARIES ON THE MODERN LAW OF REAL PROPERTY § 218 (John S. Grimes, 1980 Repl.) ("[I]f the license is revoked, the licensee is not required to remove structures placed on the premises."); and 3 TIFFANY REAL PROPERTY § 838 (3rd ed. Basil Jones) ("There is no obligation upon the licensee on revocation of the license to restore the land to the condition in which it was before he made changes therein or placed structures thereon, under authority of the license."). *See also* Jon Bruce and James Ely, THE LAW OF EASEMENTS AND LICENSES IN LAND § 11.6 ("Upon revocation of a license, the licensee is not required to

overarching consideration is that, as part of and as a condition to its private development of the land, Classic agreed with the

remove improvements made during the term of the license.")(citing *North Amber v. Haut* ).

This Court recognized that general principle in *Baltimore & Philadelphia Steamboat Co. v. Ministers & Trustees of Starr Methodist Protestant Church*, 149 Md. 163, 179, 130 A. 46, 52 (1925), although the Court found in that case special and unusual circumstances that rendered the general rule inapplicable. Both the steamboat company and the church owned wharfs, at right angles to one another, in the inner harbor area of Baltimore. The church leased its property to the steamboat company for 15 years and, as part of that lease, gave the lessee a license to erect and maintain a pier out into the river. That pier so blocked the church's own access to the river as to deprive it of independently exercising its riparian rights. When the lease to which the license was attached ended and was not renewed, the steamboat company ceased using the pier but refused to remove it, and the church sued for an order compelling the steamboat company to remove the obstruction that served to defeat its riparian rights. This Court affirmed an order to that effect. In doing so, however, we noted, *id.* at 179, 130 A. at 52:

> "For the reason that the original construction of the pier in front of the appellee's wharf was permissive for the period of the lease, the cost of the removal would, if there were not unusual circumstances, be borne by the appellant, as the general rule is well stated by the learned author of *Tiffany on Real Property* to be that, 'there is no obligation upon the licensee, on revocation of the license, to restore the land to the condition in which it was before he made changes therein or placed structures thereon, under authority of the license.' (Citation omitted). However, the circumstances were unusual."

The unusual circumstances in that case were that the pier involved three distinct properties, that restoration of the church's property could not be accomplished solely by removing the portion of the pier lying in front of its property, and that the restoration had to be done in a way that not only would fully restore the church's riparian rights but would also permit the steamboat company to use its remaining property. Under those circumstances, the Court declared, the church "should not be required to assume the risk and burden of removal and restoration." *Id.* at 179, 130 A. at 52. No such unusual circumstances are presented in this case. Indeed, Classic not only created the need for removal of the poles but agreed with the county to remove them at its expense.

The other line of cases rests on tort law, rather than property law, and hold that the failure of a licensee to remove property from the servient land upon expiration or revocation of the license constitutes a continuing trespass, for which the landowner may have remedies at both law and equity. If the requisite facts are established, that doctrine will compel a result exactly the opposite of the property law doctrine. *See*, for example, *Baltimore v. Brack*, 175 Md. 615, 3 A.2d 471 (1939); *Busada v. Ransom Motors, Inc.*, 31 Md.App. 704, 358 A.2d 258 (1976); RESTATEMENT (SECOND) OF TORTS §§ 160, 171 (1965). Regrettably, each line of cases seems to take no account of the other line, leaving us with an unresolved conflict.

county to widen Travilah Road and to make certain ancillary improvements adjacent to the road. In order to achieve those ends, it dedicated the land upon which those improvements are to be made and upon which the poles are situate to public use, making it a public right-of-way. By its own act, undertaken solely for its own economic benefit, it caused the poles to be situate on land dedicated to public use and thereby made the removal of those poles from that land necessary. Quite apart from whether PEPCO had a license or an easement and quite apart even from Classic's agreement with the county to remove the poles at Classic's expense, PEPCO and Verizon have a right under their respective franchises not to be burdened with the cost of removing the wires and poles.

The parties trace PEPCO's franchise right to distribute electric power along Travilah Road to a franchise granted by the General Assembly in 1894 to the Great Falls Power Company to "erect and maintain lines for the transmission of Electricity in Montgomery County and Prince George's County, in the State of Maryland." *See* 1894 Md. Laws, ch. 540. We shall assume that to be the case, although it would appear that PEPCO did not formally acquire that franchise until 1947, some 16 years after it obtained the right-of-way agreement from Mr. Hunter and first erected the poles.[7] The franchise authorized the company "to lay, construct and build lines or conductors, under, along, upon or over" the streets and roads in the two counties and to connect them with buildings, other structures or objects and with the place of supply. *Id.* Verizon enjoys a similar franchise. *See Bd. of County Commissioners of Garrett Cty. v. Bell Atlantic–Maryland, Inc.*, 346 Md. 160, 171–73, 695 A.2d 171, 177–79 (1997);

---

7. We traced the history of the Great Falls franchise in *Potomac Elec. Power Company v. Birkett*, 217 Md. 476, 479, 143 A.2d 485, 487 (1958). In 1902, two-thirds of the capital stock of Great Falls was acquired by Washington Railway & Electric Company, a holding company that owned PEPCO. *Id.* at 480, 143 A.2d at 488. Washington allowed Great Falls to remain dormant and permitted PEPCO to use its assets and franchises. *Id.* Presumably, PEPCO was exercising the Great Falls franchise pursuant to that corporate decision.

Maryland Code, § 8–103 of the Public Utility Companies Article. Thus, both companies have a right under their legislatively-conferred franchises to maintain poles and wires along public rights of way, "subject only to the avoidance of public inconvenience." *County Commissioners,* 346 Md. at 173, 695 A.2d at 178.

At common law, public utilities were required to bear the cost of relocating equipment in a public right of way when the relocation was required by public necessity. *See generally Norfolk Redev. & Housing Auth. v. Chesapeake & Potomac Telephone,* 464 U.S. 30, 35, 104 S.Ct. 304, 307, 78 L.Ed.2d 29, 34 (1983) ("Under the traditional common-law rule, utilities have been required to bear the entire cost of relocating from a public right-of-way whenever requested to do so by state or local authorities."). We adopted that rule in *Baltimore Gas & Elec. Co. v. State Roads Comm.,* 214 Md. 266, 270, 134 A.2d 312, 313 (1957) ("Unless the Legislature directs to the contrary, the rule is that a public utility must, at its own expense, remove and relocate its service facilities in, on or under a public road or other land owned by the State if this is made necessary by improvement or extension of the road system.") and in *Mayor and City Council of Baltimore v. Baltimore Gas & Elec. Co.,* 221 Md. 94, 156 A.2d 447 (1959), although in both cases we found a legislative direction that the utility be compensated. *See also* 12 McQuillin Mun Corp § 34.74.10 (3rd ed.) ("The fundamental common-law right applicable to franchises in streets is that the utility company must relocate its facilities in public streets when changes are required by public necessity.").

The cases in which the common law rule is invoked have usually involved situations in which the relocation is required because of changes in the right-of-way made necessary by public works projects of one kind or another and the utility seeks compensation *from the public authority* for the cost of relocation. As we pointed out in *City of Baltimore v. Baltimore Gas & Elec. Co.,* 232 Md. 123, 128, 192 A.2d 87, 89 (1963), "[m]ost of the cases in which the rule has been applied

have dealt with highway improvements or extensions, but there are many cases reaching the same result in which other *public projects* have required the utility to accommodate progress, or at least change, at its expense, in the general public interest." (Emphasis added). That was the situation in both *Norfolk Redev. & Housing Authority* and *Balto. Gas Co. v. State Roads Comm.*, *supra.* Some courts have recognized a different rule, however, when the relocation is made necessary by private development or even by a municipality when acting in a proprietary, rather than a governmental, capacity.

We applied that different rule in *City of Baltimore v. Baltimore Gas & Elec. Co., supra,* 232 Md. 123, 192 A.2d 87. In that case, Baltimore City directed the closing of certain streets in order to proceed with various projects, and that, in turn, required the Baltimore Gas & Electric Company to relocate gas lines. With respect to the projects that the Court regarded as governmental in nature, we applied the common law rule and denied the utility's demand for compensation. *Id.* at 131, 192 A.2d at 91. As to the one project that the Court regarded as proprietary in nature, however, we reached a different result and required compensation. In that regard, we observed:

> "The Courts have held generally that a proprietary exercise of power which requires the moving of utility facilities from public ways or lands puts the sovereign or its creature in competition with, or on an equal basis with, the utility; and, therefore, the State, or its agency, may not exercise its usual superior governmental right to regulate franchises without cost to itself."

*Id.* at 136–37, 192 A.2d at 94–95.

In support of that view, we cited cases from the Supreme Court, Ohio, New York, Texas, and Oregon. *Id. See also Bell Atlantic–Maryland v. Maryland Stadium Authority,* 113 Md. App. 640, 648, 688 A.2d 545, 549 (1997); *City of Pontiac v. Consumers Power Co.,* 101 Mich.App. 450, 300 N.W.2d 594, 596 (1980). Although we have since expressed some skepticism as to the practicality of the governmental/proprietary

distinction and have declined to extend that distinction into new areas (*see Baltimore County v. RTKL,* 380 Md. 670, 688–89, 846 A.2d 433, 444 (2004)), we have not discarded the doctrine as it has previously been applied. The rule applied in *City of Baltimore* necessarily must apply with even greater force when the relocation is made necessary by the actions of a private developer for its own economic benefit.

That very issue was presented in *Pacific Gas & Electric Co. v. Dame Construction Co.,* 191 Cal.App.3d 233, 236 Cal.Rptr. 351 (1987). There, as here, as a condition to approval of a proposed residential development, a private developer was required to widen an adjacent road, which necessitated the relocation of electric utility poles. The developer widened the road but refused to remove the poles, causing the county to order the utility to remove them. The utility did so and then sued the developer to recover the cost. Affirming a judgment for the utility, the court declined to apply the traditional common law rule, holding that it was limited to the situation where relocation was required by a valid governmental act—that the purpose of the common law rule was to insulate the government and the taxpayers from the cost. The court declined to treat the developer's work, undertaken as a condition to its development of the land, as a governmental act. Instead, applying a benefit analysis, the court concluded that:

"[W]hile the general public would also benefit from the road widening, the primary beneficiary of the work was [the developer], which would not have been permitted to develop its land without agreeing to widen the adjacent boulevard. Since [the developer] presumably enjoys the economic opportunity that the development represents, it seems proper that it should also bear the attendant costs."

*Id.* at 240, 236 Cal.Rptr. at 356. The court added that it was "economically and otherwise fair that [the developer] bear these costs because it had reason to anticipate it would have to do so." *Id.* at 241, 236 Cal.Rptr. at 356.

The Missouri appellate court reached the same conclusion in *Home Builders v. St. Louis Cty., Water Co.,* 784 S.W.2d 287

(Mo.App.1989) and for largely the same reason. There, too, relocation of roadway utility lines became necessary by reason of private development projects, and the developers insisted that the utility bear the cost of removal. Affirming a judgment for the utility, the court stressed that "the actions of private developers constructing their projects, not the actions of a governmental entity, have caused the need for right-of-way improvements and have, in turn, necessitated water facility relocations.... While the right-of-way improvements incidentally accomplish a public purpose, they primarily accomplish private sector purposes...." *Id.* at 291.

█ Whether we adopt a benefit analysis as the California court did or simply hold, in conformance with the implications from *City of Baltimore v. Baltimore Gas & Elec. Co., supra,* that, where the relocation is triggered and made necessary by a private development, the common law rule does not apply and the developer must pay the cost of the relocation, is not likely to make much difference. The end result under either approach will, in almost all instances, be the same. The automatic rule is the easier to apply and avoids the prospect of extensive litigation and endless discovery over who, among any number of possible parties, may be the principal beneficiary of particular road improvements occasioned by a private development. Largely for that reason, we shall adopt that approach, reserving, however, the option of revisiting that decision should a truly extraordinary case arise that may justify using a benefit approach instead. We find no legal basis, and certainly no equitable one, for requiring a utility's rate-paying customers to bear a cost triggered and made necessary by a private developer's project and thus, in effect, to subsidize the cost of the development.[8]

---

8. There is nothing in the record to indicate the nature of any franchise held by Comcast, so we have no basis for applying the same rule to it as we apply with respect to PEPCO and Verizon. Clearly, there is no basis for imposing the cost of removing the poles on Comcast. Whether Comcast is responsible for the cost of removing its lines is a matter that the court can consider on remand.

JUDGMENT REVERSED; CASE REMANDED TO CIR-
CUIT COURT FOR FURTHER PROCEEDINGS AND EN-
TRY OF DECLARATORY AND OTHER JUDGMENT IN
CONFORMANCE WITH THIS OPINION; APPELLEE TO
PAY THE COSTS.