THE PORT OF NEW YORK AUTHORITY, PLAINTIFF-RE-
SPONDENT, v. HACKENSACK WATER COMPANY (A
CORPORATION OF NEW JERSEY), DEFENDANT-APPEL-
LANT.

THE PORT OF NEW YORK AUTHORITY, PLAINTIFF-APPEL-
LANT, v. PUBLIC SERVICE ELECTRIC AND GAS COM-
PANY, A CORPORATION OF THE STATE OF NEW JER-
SEY, DEFENDANT-RESPONDENT.

THE PORT OF NEW YORK AUTHORITY, PLAINTIFF-AP-
PELLANT, v. NEW JERSEY BELL TELEPHONE COM-
PANY, A CORPORATION OF THE STATE OF NEW
JERSEY, DEFENDANT-RESPONDENT.

Argued September 9 and 10, 1963—Decided November 6, 1963.

*Mr. Francis A. Mulhern* argued the cause for The Port of New York Authority (*Mr. Sidney Goldstein* and *Mr. Daniel B. Goldberg,* of the New York Bar, of counsel).

*Mr. Joseph Keane* argued the cause for appellant Hackensack Water Company (*Mr. John B. O'Neill,* of counsel; *Mr. Samuel W. Zerman,* attorney).

*Mr. Henry J. Sorenson* argued the cause for respondent Public Service Electric and Gas Company.

*Mr. Michael J. O'Neil* argued the cause for respondent New Jersey Bell Telephone Company (*Mr. Thomas Glynn Walker* and *Mr. Sidney D. Weiss,* of counsel).

The opinion of the court was delivered by

WEINTRAUB, C. J. Improvements undertaken by the Port of New York Authority (herein Port Authority) with respect to the George Washington Bridge, Holland and Lincoln Tunnels, and Port Newark Marine Terminal required the relocation of facilities of utility companies in the public streets. The question is whether the Port Authority or the utility companies must absorb the cost of relocation. The work was done under agreements reserving that issue. In its suit against Hackensack Water Company, the Port Authority prevailed. *Port of New York Authority v. Hackensack Water Co.,* 73 *N. J. Super.* 332 (*Law Div.* 1962). In its suits

against Public Service Electric and Gas Company and New Jersey Bell Telephone Company, another judge of the trial court took a different view and held for the companies. *Port of New York Authority v. Public Service, etc., Co.,* 76 *N. J. Super.* 359 (*Law Div.* 1962). We certified the appeal in the first case on our own motion and granted the Port Authority's petition for certification in the other matters. 39 *N. J.* 468 (1963).

In 1921 the States of New Jersey and New York entered into a compact with the consent of the Congress whereby they pledged their faithful cooperation in the planning and development of the Port of New York and created the Port Authority "as an instrumentality or agency of the two states to effectuate such pledge of co-operation." *R. S.* 32:1–25. The States adopted a comprehensive plan for the development of the port, which plan contemplated bridges, tunnels, and sundry terminal facilities. *R. S.* 32:1–26 *et seq.* The States agreed, *R. S.* 32:1–33:

"The Port of New York Authority is hereby authorized and directed to proceed with the development of the port of New York in accordance with said comprehensive plan as rapidly as may be economically practicable and is hereby vested with all necessary and appropriate powers not inconsistent with the constitution of the United States or of either state, to effectuate the same, except the power to levy taxes or assessments. * * * The port authority shall be regarded as the municipal corporate instrumentality of the two states for the purpose of developing the port and effectuating the pledge of the states in the said compact, but it shall have no power to pledge the credit of either state or to impose any obligation upon either state, or upon any municipality, except as and when such power is expressly granted by statute, or the consent by any such municipality is given."

In 1931 the States by concurrent legislation agreed "in the interest of the users of such bridges and tunnels and the general public" that the bridges and tunnels then or thereafter authorized be unified as to construction, maintenance, operation and control "to the end that the tolls and other revenues therefrom shall be applied so far as practicable to the costs of the construction, maintenance and operation" of such facili-

ties as a group, "it being the policy of the two said states that such bridges and tunnels shall as a group be in all respects self-sustaining." *R. S.* 32:1–118. The Port Authority was authorized to levy "such tolls and other charges as it may deem necessary to secure from all of such bridges and tunnels as a group, at least sufficient revenue to meet the expenses of the construction, maintenance and operation of such bridges and tunnels as a group, and to provide for the payment of the interest upon and amortization and retirement of and the fulfillment of the terms of all bonds and other securities and obligations which it may have issued or incurred in connection therewith." *R. S.* 32:1–121. The States declared, *R. S.* 32:1–131:

"The construction, maintenance and operation of vehicular bridges and tunnels within the said Port of New York District (including the said Holland tunnel and the said Midtown Hudson tunnel), are and will be in all respects for the benefit of the people of the states of New York and New Jersey, for the increase of their commerce and prosperity and for the improvement of their health and living conditions; and the port authority shall be regarded as performing an essential governmental function in undertaking the construction, maintenance and operation thereof and in carrying out the provisions of law relating thereto, and shall be required to pay no taxes or assessments upon any of the property acquired or used by it for such purposes."

Two small items here involved relate to the Port Newark Marine Terminal, operated by the Port Authority under a lease from its owner, the City of Newark, pursuant to legislation of the States of which the New Jersey counterpart is *N. J. S. A.* 32:1–35.28 *et seq.* These terminal facilities are in the public use. See *Port of New York Authority v. City of Newark,* 20 *N. J.* 386 (1956).

The utility companies placed their property in the public ways under the authority of acts of the Legislature. We find no language in any of them which controls the issue before us, and hence it is enough merely to cite the statutory sources as they presently exist. *R. S.* 48:7–1, 2; 48:17–8, 10, 11, 12; 48:19–17.

## I.

The companies contend they have a "vested right" in the streets which may not be taken except by condemnation and may be burdened, short of a taking, only by the exercise of the police power as in the case of property rights generally. Although the companies agree a utility may be required to relocate at its own cost (subject to constitutional limitations to which we will later refer), they say the obligation can arise only when an order to relocate is given by an authority that possesses the police power to give the order. They say the power so to order rests in the State as the ultimate sovereign over public roads, *Hackensack Water Co. v. Ruta*, 3 *N. J.* 139, 146 (1949), and that although the power may be delegated to the State's subdivisions and agencies, it has not been delegated to the Port Authority in express terms. And, the argument continues, a delegation ought not to be implied in view of the doctrine of strict construction heretofore expressed in another connection with respect to the powers of another agency in *Driscoll v. Burlington-Bristol Bridge Co.*, 8 *N. J.* 433, 490 (1952), *cert.* denied 344 *U. S.* 838, 73 *S. Ct.* 25, 97 *L. Ed.* 652 (1952).

If the case turned upon a delegation of such power, we would find it, but we think the utilities misconceive the source of their obligation to relocate. That obligation does not originate in a specific order to relocate. Rather it antedates the occasion for relocation and rests upon the common law's view of the rights and responsibilities of the recipient of a so-called franchise to use the public streets. A utility company is permitted to locate its lines within the public right of way as a use ancillary to the principal and primary use of the way by the public. *Nicoll v. New York & New Jersey Telephone Co.*, 62 *N. J. L.* 733, 735 (*E. & A.* 1899); *Laurel Garden Corp. v. New Jersey Bell Telephone Co.*, 109 *N. J. L.* 171 (*E. & A.* 1932). It is permitted to use the public way because it serves a public interest, but since its venture is for gain and since in any event the primary purpose of the

public easement is the public's own use of it, the utility's interest in the public way is subordinate to the public's enjoyment of it. Hence the utility runs the risk that the public welfare may require changes in the road which will call for relocation of its facilities. *New Orleans Gaslight Co. v. Drainage Comm.*, 197 *U. S.* 453, 461, 25 *S. Ct.* 471, 49 *L. Ed.* 831, 835 (1905).

This view of the subject was clearly expressed a century ago in *Jersey City v. City of Hudson*, 13 *N. J. Eq.* 420 (*Ch.* 1861), and was later restated in *Postal Tel. Cable Co. v. Delaware, L. & W. R. R.*, 89 *N. J. Eq.* 99 (*Ch.* 1918), affirmed o. b. 90 *N. J. Eq.* 273 (*E. & A.* 1919); see also *Walker v. North Bergen*, 84 *N. J. L.* 248 (*Sup. Ct.* 1913), and *New Jersey Bell Tel. Co. v. Delaware River Joint Comm'n*, 125 *N. J. L.* 235 (*Sup. Ct.* 1940). The thesis is well supported elsewhere. See *Southern California Gas Co. v. City of Los Angeles*, 50 *Cal. 2d* 713, 329 *P. 2d* 289, 290 (*Sup. Ct.* 1958); *Los Angeles County Flood Control Dist. v. Southern California Edison Co.*, 51 *Cal. 2d* 331, 333 *P. 2d* 1, 3–4 (*Sup. Ct.* 1958); *New York City Tunnel Authority v. Consolidated Edison Co.*, 295 *N. Y.* 467, 68 *N. E. 2d* 445, 448 (*Ct. App.* 1946); *New Rochelle Water Co. v. State*, 10 *N. Y. 2d* 287, 220 *N. Y. S. 2d* 809, 177 *N. E. 2d* 771, 772 (*Ct. App.* 1961); *State v. Public Util. Dist. No. 1 of Clark County*, 55 *Wash. 2d* 645, 349 *P. 2d* 426 (*Sup. Ct.* 1960); 18 *Am. Jur., Eminent Domain* § 161, *p.* 792 (1938); 12 *McQuillin, Municipal Corporations* (*3d ed.* 1950), § 34.72, *p.* 240; *Rhyne, Municipal Law* § 24–6, *p.* 512 (1957).

In this area the authorities frequently refer to the police power. The true connection between the police power and the relocation of facilities is not, as the companies urge, that the duty to relocate is generated in each specific instance by a decision under the police power to impose it. Rather the meaning is that the utility's interest in the street was intended to be subordinate to the police power, that is to say, that government's authority to exert its police power in the street for the public welfare was not bargained away in the least by the

legislative grant to the utility company. Hence, if government undertakes an activity in the street in the exercise of the police power, the utility must figuratively move over at its own expense to the end that the exercise of the police power will not be impeded or burdened. And this the utility must do because the law governing the basic arrangement obliges it to do so.

The companies stress the statement found in some cases that a utility's interest in the public easement is a "vested right." Such labels may conceal as much as they reveal. It may be that a utility acquires a "vested right," at least when it makes an investment in the road on the strength of the legislative grant, as was said in *Rockland Electric Co. v. Montvale,* 104 *N. J. L.* 480, 484 (*Sup. Ct.* 1928) ; *Phillipsburg Elec., etc., Co. v. Town of Phillipsburg,* 66 *N. J. L.* 505 (*Sup. Ct.* 1901), and *Hudson Tel. Co. v. Jersey City,* 49 *N. J. L.* 303, 306 (*Sup. Ct.* 1887). But rights come in different sizes, and hence it does not end the inquiry to find the companies hold something of that undefined stature. As was said in *Jersey City v. City of Hudson, supra,* 13 *N. J. Eq.,* at *p.* 424, granted the utility holds a "property" interest, "the question still recurs, what is the limit of that right?" True, no doubt, a company's right in the street is protected against arbitrary action and in that sense its interest may be described as "vested," but it is not suggested that the Port Authority's plans unnecessarily or arbitrarily required the relocations. The question then is whether a utility company's "vested right" is equal to the public's right to use the public easement or is subordinate to it, and the answer given by our precedents is, we think, unequivocal.

And, we may add quickly, the cases we have cited are not questioned by others to which we are referred in which the utility's right of way was in *private* property rather than an interest in the public's right of way. *Morris & Essex R. R. v. City of Orange,* 63 *N. J. L.* 252, 270 (*E. & A.* 1899) ; *Board of Chosen Freeholders v. New York Bay R. R.,* 84 *N. J. L.* 354 (*E. & A.* 1913) ; *Public Service Ry. v. Hudson & Essex*

*Freeholders,* 85 *N. J. Eq.* 290 (*Ch.* 1915). Nor is it significant that a utility may hold in addition to the legislative grant the consent of the owner of the underlying fee because it uses poles and lines within the public easement for purposes beyond those of the public easement. See *Laurel Garden Corp. v. New Jersey Bell Tel. Co., supra,* 109 *N. J. L.* 171; *French v. Robb,* 67 *N. J. L.* 260 (*E. & A.* 1902); *R. S.* 48:7–1, 48:17–8; *N. J. S. A.* 48:3–17.1. The public's right in the public easement antedates and is superior to the additional interest the utility obtains from the owner of the fee. Accordingly, when the public claims its paramount right in the public easement, the utility cannot resist that right on the basis of the subordinate grant from the abutting owner.

██ Nor is the issue affected by statutes which impose an "in lieu of" excise tax because the tax is stated in part to be payment "for the franchise to use such public streets," *N. J. S. A.* 54:30A–18, or "for the privilege of exercising its franchises and using the public streets," *N. J. S. A.* 54:30A–54. Those statutes do not reveal a legislative intent to enlarge the utility's property interest or to alter the common law's conception of the utility's obligation to relocate its lines.

██ In connection with the "delegation" thesis, the companies cite *R. S.* 40:67–7 to 9 under which after hearing a municipality may order relocation of such facilities and do the work at the owner's expense if the owner fails to comply. These provisions do not support that claim, for they are not the source of a utility's obligation to relocate. They are part of the Home Rule Act of 1917, and of course the utility's obligation arose under the common law long before that statute. Rather the statute provides for the fair enforcement of a subsisting obligation by calling for notice and hearing with respect to the planned project and by authorizing a municipality to do the work at the owner's expense if the owner defaults. And we add as an aside that if the thesis were accepted that municipalities are delegated the police power to decide in each instance whether to order relocation at a company's expense, it would follow that one municipality could

impose the cost while another municipality in identical circumstances could absorb it. That would be an odd way to deal with the subject. Indeed, prior to the Home Rule Act it was held that a municipality could not assume the cost of relocation which the common law imposed upon the utility company. *Walker v. North Bergen, supra,* 84 *N. J. L.* 248; see also *First Nat'l Bank v. Maine Turnpike Authority,* 153 *Me.* 131, 136 *A. 2d* 699, 711 (*Sup. Jud. Ct.* 1957). The Home Rule Act was not intended to make a utility's liability depend upon legislative decision at the municipal level.

The question then is not whether the Legislature "delegated" to the Port Authority the "police power" to order the utilities to relocate. Rather the question is whether the improvements which the Legislature authorized the Port Authority to make constitute an enjoyment of the public's paramount right in the streets, or, in terms of "police power," whether the decision to make those improvements rests upon that power. If they do, then the utilities must move their property at their own expense.

Travel anciently was the principal and primary use of the public street. Bridges and tunnels are part and parcel of that subject and hence no more need be said to show the improvements as to them are within the public's paramount right in the streets. As noted above, two items relate to a marine terminal. The case was not tried in a way to differentiate those items. The terminal activities no doubt relate to the movement of traffic over the public streets, but if the connection be not as immediate as we assume it to be, still it seems clear that the public's paramount right is not confined to travel but rather embraces all public uses. *Walker v. North Bergen, supra,* 84 *N. J. L.* 248, involved a sewer improvement. The subject is discussed at length in *City of Baltimore v. Baltimore Gas & Elec. Co.,* 232 *Md.* 123, 192 *A. 2d* 87, 89 (*Ct. App.* 1963), where the erection of schools and public housing was held to be within the public's paramount right. Or, to approach the subject in terms of the police power, the question is whether the public improvement is made under the

warrant of the police power. The answer is that all activity of a State and its subdivisions and agencies must necessarily rest upon the police power. The power to undertake any project—whatever its nature—is part of the power to provide for the public well-being and comfort and that power is the police power. There is no other power, except the power to tax and the power of eminent domain which the State may invoke to acquire what it needs to accomplish its objective under the police power.

Hence the utilities must pay the costs here involved unless (1) the projects are beyond the common law doctrine because they are self-sustaining; or (2) the Legislature has decreed that the Port Authority absorb the costs; or (3) the imposition of these costs would violate some constitutional guaranty by reason of the special facts of these cases. We turn to those issues.

## II.

In 1930 the companies questioned their liability for relocation costs in connection with the construction of the approach to the George Washington Bridge. The Port Authority yielded, its legal department explaining in a letter to Public Service Electric and Gas Company:

"In view of the legislative determination of the two States expressly embodied in our bridge statutes, that the Port Authority is exercising a governmental function in constructing and operating the various interstate vehicular crossings, we cannot, of course, concur in the proposition that it is acting in a proprietary capacity, and is on the same plane as is the City in operating rapid transit. However, the conclusion has been reached that as a matter of public policy it is more appropriate to charge costs of any re-locations of public utilities necessitated by bridge construction against the bridge, where they will be ultimately charged against the users of the bridge, rather than to attempt to charge them against the public utility companies, where they will be ultimately charged against the consumers who as a class will not be necessarily benefited by the construction of the bridge. We feel that this is in accordance with the fundamental principles of public policy and economics underlying the organization of the Port Authority."

The Port Authority apparently abided by that stand until the decision in *New York City Tunnel Authority v. Consolidated Edison Co., supra,* 295 *N. Y.* 467, 68 *N. E. 2d* 445. That case involved liability for relocation costs occasioned by the construction of an intrastate toll tunnel. The Port Authority filed a brief *amicus curiae* in which it said:

"* * * We believe that once the governmental character of the Tunnel Authority and its activities is established, it follows from the decided cases that the private utility companies must bear the expense of relocating their facilities to accommodate the Authority's highway program. But we are more concerned with establishing the initial proposition of such governmental character than the final proposition of the utility companies' liability."

Although the Port Authority stressed its preoccupation with the governmental nature of the activity because of possible consequences in other contexts, still, as the quotation indicates, the Port Authority did in effect shift from the view it had taken some 16 years earlier with respect to costs of relocation. The Court of Appeals held for the Tunnel Authority, and we gather the Port Authority, deeming that decision applicable to its operations, thereafter insisted the utilities must bear the expense of relocation. Accordingly, it entered into agreements, like those before us, under which work was done subject to judicial determination thereafter with respect to liability. In an action on the New York side of the harbor under such an agreement, the Port Authority prevailed in *Port of New York Authority v. Consolidated Edison Co.,* 27 *Misc. 2d* 45, 205 *N. Y. S. 2d* 781 (*Sup. Ct., N. Y. Co.* 1960). We are informed an appeal is pending in that case.

In distinguishing in its letter quoted above between "governmental" and "proprietary" functions, the Port Authority reflected a line drawn in litigation between municipalities and utility companies. There are cases holding that if a municipality embarks upon a utility operation, it may be exercising a "proprietary" function and if so, it cannot call upon a private utility company already in the public street to make way for it. *City of Baltimore v. Baltimore Gas & Elec. Co.,*

*supra* (232 *Md.* 123, 192 *A. 2d,* at *p.* 94) ; *In re Gillen Place, Borough of Brooklyn, City of New York,* 304 *N. Y.* 215, 106 *N. E. 2d* 897 (*Ct. App.* 1952) ; *Jamaica Water Supply Co. v. New York City,* 280 *App. Div.* 834, 114 *N. Y. S. 2d* 79 (*2d Dept.* 1952) ; *State ex rel. Speeth v. Carney,* 163 *Ohio St.* 159, 126 *N. E. 2d* 449, 460 (*Sup. Ct.* 1955) ; see *City of Los Angeles v. Los Angeles Gas & Elec. Co.,* 251 *U. S.* 32, 40 *S. Ct.* 76, 64 *L. Ed.* 121 (1919).

The distinction between "governmental" and "proprietary" is always unsatisfactory. We have used it in dealing with the problem of municipal tort liability, but we declined, for example, to import it into an intermunicipal zoning controversy, saying in *Washington Twp. v. Ridgewood Village,* 26 *N. J.* 578, 584 (1958) :

"* * * The distinction is illusory ; whatever local government is authorized to do constitutes a function of government, and when a municipality acts pursuant to granted authority it acts as government and not as a private entrepreneur. The distinction has proved useful to restrain the ancient concept of municipal tort immunity, not because of any logic in the distinction, but rather because sound policy dictated that governmental immunity should not envelop the many activities which government today pursues to meet the needs of the citizens. *Cloyes v. Delaware Township,* 23 *N. J.* 324 (1957). We see no connection between that classification and the problem before us. * * *"

Even where the distinction is recognized in a relocation matter, the fact that a charge is made for the service does not of itself stamp the operation as "proprietary." See *City of Baltimore v. Baltimore Gas & Elec. Co., supra,* 232 *Md.* 123, 192 *A. 2d* 87, involving public housing. As was said in another connection[1] with reference to a municipal water system, *Brush v. Commissioner of Int. Revenue,* 300 *U. S.* 352, 372– 373, 57 *S. Ct.* 495, 81 *L. Ed.* 691, 700 (1937) :

---

[1] The result reached in *Brush* was later disapproved for other reasons. *Helvering v. Gerhardt,* 304 *U. S.* 405, 422–423, 58 *S. Ct.* 969, 82 *L. Ed.* 1427, 1439 (1938).

"* * * And to say that, because the city makes a charge for furnishing water to private consumers, it follows .that the operation of the water works is corporate and not governmental, is to beg the question. What the city is engaged in doing in that respect is rather rendering a service than selling a commodity. If that service be governmental, it does not become private because a charge is made for it, or a profit realized. A state, for example, constructs and operates a highway. It may, if it choose, exact compensation for its use from those who travel over it (see Bingaman v. Golden Eagle Western Lines, 297 U. S. 626, 628, 56 S. Ct. 624, 80 L. Ed. 928 [930] ; but this does not destroy the claim that the maintenance of the highway is a public and governmental function. The state or the city may exact a tuition charge for instruction in the public schools ; but thereby the maintenance of the public schools does not cease to be a function of the government. The state exacts a fee for issuing a license or granting a permit; for recording a deed; for rendering a variety of services in the judicial department. Do these various services thereby lose their character as governmental functions? The federal Post Office Department charges for its services; but no one would question the fact that its operation calls into exercise a governmental function."

In any event we need not say whether the distinction is ever relevant to the problem of relocation, since the distinction relates only to activities of municipalities. It is there that it is thought that certain powers are given to a municipality as agent for the State and are therefore "governmental," while other powers are given it in its "corporate" capacity to be exercised in behalf of its own citizenry under which it may pursue so-called "proprietary" activities. So far as we know, no jurisdiction has held that an activity pursued by the State itself directly or by an agency will be deemed to be "proprietary" in a relocation controversy.

In the relatively few cases involving the problem, it has been unanimously held that toll operations such as those before us conducted by corporate agents of the State are public uses of the right of way which require a utility company to relocate its facilities at its expense. We have already referred to the New York cases. We add *First Nat'l Bank v. Maine Turnpike Authority, supra,* 153 *Me.* 131, 136 *A. 2d* 699; *Delaware River Port Authority v. Pennsylvania Public Utility Comm.,* 393 *Pa.* 639, 145 *A. 2d* 172 *(Sup. Ct.* 1958).

Perhaps the earliest decision to that effect is that of our former Supreme 'Court in *New Jersey Bell Tel. Co. v. Delaware River Joint Comm., supra,* 125 *N. J. L.* 235. The companies suggest that case holds only that the utility failed in the action because it had selected the wrong remedy. We cannot agree. The court held the utility's loss was "consequential" (at *p.* 239 of 125 *N. J. L.*), which characterization, especially in the light of the citation immediately following it, can mean only that no right of the utility was violated. The case was so understood by the New York Court of Appeals and cited to support its holding in *New York City Tunnel Authority, supra,* 295 *N. Y.* 467, 68 *N. E.* 2*d* 445.

*Taylor v. New Jersey Highway Authority,* 22 *N. J.* 454 (1956), and *McCabe v. New Jersey Turnpike Authority,* 35 *N. J.* 26 (1961), are not to the contrary. They involved liability for negligence. We there found the Legislature did not intend to cloak the activities of its corporate agent with the immunity of the State and hence held the agency accountable for its wrong upon principles of law applicable to others. Those decisions do not suggest that when the State acts through a corporate agent instead of its executive branch, it thereby evidences an intent to relieve a utility of its obligation to the State.

The companies urge the common law doctrine was evolved in a contest between the user of the private utility's service and the general taxpayer, whereas here, since the State's credit is not pledged to support the Port Authority, the contest is between the user of the companies' facilities and the user of the Port Authority's facilities. Hence we are told we must choose between consumers and should prefer the consumer of the earlier facility. The companies add that the Port Authority's improvement conferred no benefit upon their consumers, a truth which we think does not improve their case since it is equally true that the relocation of their lines did not enhance the enjoyment of the Port Authority's improvement. In other words, a loss is involved, and the question is who shall

take it and whether it matters that the taxing power of the States is not immediately involved.

We are not persuaded that one user is thus arrayed against another user. For one thing, there is the private investor in the utility company who has a stake notwithstanding that in theory the cost can be passed along. But more importantly, the Port Authority cannot be thus divorced from the citizens and the taxpayers it was created to serve.

The Port Authority is the agent of the States and of each of them. *County of Bergen v. Port of New York Authority,* 32 *N. J.* 303, 306 (1960); *State v. Murphy,* 36 *N..J.* 172, 185 (1961); *Moonachie v. Port of New York Authority,* 38 *N. J.* 414, 415 (1962); *Whalen v. Wagner,* 4 *N. Y. 2d* 575, 176 *N. Y. S. 2d* 616, 152 *N. E. 2d* 54, 58 (*Ct. App.* 1958). And in a sense, the user of its facilities is a taxpayer, as the New York Court of Appeals said in rejecting the same argument in *New York City Tunnel Authority, supra,* 68 *N. E. 2d,* at *p.* 449:

"* * * The imposition of a toll or charge for the use of the new improvement does not make the operation a business enterprise carried on for profit, * * *. Rather, it creates a new class of taxpayers thought to be more justly charged with the cost of the new improvement. The Legislature's choice of the incidence of this taxation should not, and does not, change applicable principles. Imposing no new burdens on respondents, it was certainly not intended to relieve them of obligations to which they were subject by well-established rules."

Further, the general taxpayer too has an interest in such agencies. First, he might be asked to provide the facilities if the State could not supply them through the agency. In fact the Holland Tunnel was built with the funds of the States. Next, these agencies may also furnish facilities that are not self-supporting and hence would burden the general taxpayer if furnished directly by the State. This, we gather, is true of the Port Authority. Further, it may be doubted as a practical matter that government would walk away from an agency which founders; financial failure would prejudice the ac-

ceptance of the bonds of other agencies of the same sovereign. And finally, the net assets of these agencies belong to the States that created them, and the taxpayers and citizens will profit from the use to which they are put after the bonds are liquidated.

If in the changing scene an equity has emerged in favor of the private utility, it is not because the user of the public improvement pays for it, but rather because the high incidence of these public projects or the nature of a particular one may suggest some relief is appropriate. Conceivably the total costs could overwhelm a small utility, and one could question the justice of leaving the burden with a small group of utility consumers when the project is a major highway which merely rushes by them.

Our Legislature changed the rule of the common law with respect to toll roads in New Jersey Highway Authority Act (*N. J. S. A.* 27:12B-6), New Jersey Expressway Authority Act (*N. J. S. A.* 27:12C-16), and New Jersey Turnpike Authority Act of 1948 (*N. J. S. A.* 27:23-6). Counsel point to similar statutes in many other States. We think the Legislature acted for the reasons we have suggested rather than on the utilities' thesis that the taxpayers are not concerned with toll operations, because the State in fact guaranteed the payment of the bonds of the New Jersey Highway Authority, see *Behnke v. New Jersey Highway Authority,* 13 *N. J.* 14 (1953), and further the Legislature shifted the burden of relocation in *N. J. S. A.* 27:7A-7, which deals with non-toll freeways and parkways.

Indeed, much of the recent ferment concerned non-toll highways. It was caused by the Federal Aid Highway Act of 1956. That measure (now 23 *U. S. C. A.* § 123) provides for reimbursement with respect to relocation costs in the same proportion as federal funds are expended on the highway project, if the payment of relocation costs does not violate the law of the state or a contract between the utility and the state. This stimulated state legislation to relieve private utilities of the common law rule, at least as to projects qualifying for

federal aid. According to Senate Report No. 1407 (March 22, 1958), 40 states considered such measures in 1956–57. The legislatures of 22 states adopted bills, of which six were vetoed. This development led the majority to say in the report that "The committee did not contemplate this drastic change in existing practices when the 1956 act was enacted, and realizes that the use of Federal funds for reimbursement to the States for this purpose will increase substantially, thereby reducing the amount of Federal funds available for construction of highways." The majority accordingly recommended certain amendments, 2 *U. S. Code Cong. & A. News, 85th Cong., 2d Sess., p.* 2383 (1958), which the minority members resisted upon the basis of equities they thought were generated by a crash program for interstate highways, at *pp.* 2396–99.

We are not persuaded we should overturn the common law doctrine or seek to fashion exceptions upon an appraisal of each project. We think the subject should be left to legislative decision. Our Legislature has acted on a selective basis. We have already cited statutes relating to major highways. There are similar provisions in statutes relating to other subjects. See Sewerage Authorities Law (*N. J. S. A.* 40:14A–20) ; The Port Authorities Law (*N. J. S. A.* 40:68A–54) ; Local Housing Authorities Law (*N. J. S. A.* 55:14A–39) ; New Jersey Water Supply Act (*N. J. S. A.* 58:19–19) ; New Jersey Water Supply Law, 1958 (*N. J. S. A.* 58:22–14).

The question then is whether the Legislature has revealed an intent to change the rule as to the Port Authority's projects. The companies insist that it has.

In this connection, stress is understandably placed upon the position the Port Authority took in 1930 as revealed in the letter quoted above. The companies emphasize also that from 1930 to 1946 both the minutes of the Port Authority submitted to the Governors and its annual reports to the Legislatures reflected project costs which included the expense of relocations. Even if we assumed the minutes and the reports

were truly revealing of the Port Authority's position on the subject, still laws cannot be enacted in that way. These several circumstances could be meaningful only if the language of the statute reasonably supported the Port Authority's 1930 view of it.

The Port Authority explains that its earlier position reflected an exercise of "discretion" rather than "a confident interpretation of the statute," see *De Sylva v. Ballentine,* 351 *U. S.* 570, 577, 76 *S. Ct.* 974, 100 *L. Ed.* 1415, 1426 (1956). In any event, the letter referred to no specific statutory phrase, but rather to "the fundamental principles of public policy and economics underlying the organization of the Port Authority." It seems to us that it still remains for the Legislature to say whether, in the light of those principles and economics, the burden the common law places on the private utility should be shifted to the public.

The companies point to general provisions in Port Authority statutes for the issuance of bonds to cover the entire cost of each project and the imposition of tolls to yield sufficient revenue to cover those costs, and also to provisions for condemnation couched in terms which could embrace the interest of the utilities.[2] All of these provisions are consonant

---

2 The companies also urge that *L.* 1922, *c.* 273, § 2 made the costs of these relocations a part of the cost of the construction of the Holland Tunnel and that its provision should be found to apply to the Port Authority to which the operation of that tunnel was later committed. Reading section 2 in the light of the entire 1922 statute and the provisions of *L.* 1919, *c.* 70 and *L.* 1920, *c.* 76 [See *N. J. S. A.* 32 :2–27] relating to the displacement of "any waterway, canal, railroad or street railway" (probably from their *private* rights of way), we believe that section 2 of the 1922 statute did not deal with the cost of the relocation of the facilities of other utilities directly caused by the tunnel improvement itself. Rather section 2 dealt with the cost of such other utility relocations only when they resulted from the vacation of *additional* public roads vacated by the New Jersey commission to the end that a displaced waterway, canal, railroad or street railway could be relocated. If such displaced railroad or street railway, for example, had itself sought a new location in another public street, it would have had to relocate the facilities of another utility already in the road. Section 2 thus required the commission to do what such rail-

with the simple proposition that the Port Authority was equipped to meet whatever costs had to be met. We cannot fairly find in such language a purpose to burden the agency with a cost which the existing law places upon another. See *New Jersey Bell Tel. Co. v. Delaware River Joint Comm., supra*, 125 *N. J. L.*, at p. 237; *Delaware River Joint Toll Bridge Comm., etc. v. Colburn*, 310 *U. S.* 419, 432, 60 *S. Ct.* 1039, 84 *L. Ed.* 1287, 1291 (1940); *New York City Tunnel Authority v. Consolidated Edison Co., supra*, 295 *N. Y.* 467, 68 *N. E. 2d*, at p. 449. We should not lightly infer that the Legislature transmuted a private liability into a public one, especially when it is so easy to state that purpose in plain terms as the Legislature did in the other statutes to which we have referred. See *Sayreville v. Pennsylvania R. R.*, 26 *N. J.* 197, 208 (1958), appeal dismissed 358 *U. S.* 44, 79 *S. Ct.* 43, 3 *L. Ed. 2d* 45 (1958).

Although the controversy orignated in 1946, the Legislature did not deal with the subject in any statute which thereafter authorized the Port Authority to undertake a project. In 1960 the Legislature did adopt *Senate No.* 206 which was directed to the specific issue and would have resolved it in favor of the utilities, but the measure did not receive the Governor's approval. Similar bills (A-524 and A-579) introduced the next year died in committee.

We note that the 1960 measure required concurrent legislation by the State of New York. It thus followed the pattern of *P. L.* 1935, *c.* 186, *N. J. S. A.* 32:1–155, 156, which had made the Port Authority liable for consequential damages resulting from a change of grade, upon the adoption of a like

---

road or street railway would have had to do if it acted on its own in moving to another location. The record does appear to indicate that the States through their separate commissions paid for all utility relocations within the roads used for the tunnel improvement itself, but if so, we doubt that it was by virtue of the 1922 statute. In any event we cannot find the alleged obligation was transmitted to the Port Authority even with respect to additional improvements relating to the Holland Tunnel.

measure in New York. In *Moonachie v. Port of New York Authority, supra*, 38 *N. J.*, at *p*. 425, we observed that "Since the Authority is an instrumentality of New York and New Jersey, it is eminently desirable, of course, that the path of judicial decision in the courts of the two States be a common one." We refer to this approach, not to suggest that the compact between the States would prevent unilateral legislative treatment of this topic, a matter upon which we intimate no view, but rather to emphasize again the desirability of a common approach to these problems, a course we believe the courts in both States take upon the issue before us.

 Finally it is urged that in the total circumstances the imposition of the burden upon the private utilities takes their property without due process of law, citing *Nashville, C. & St. L. Ry. v. Walters*, 294 *U. S.* 405, 55 *S. Ct.* 486, 79 *L. Ed.* 949 (1935). That case involved the private right of way of a railroad which was later intersected by a new state highway. The statute required the railroad to pay half of the cost of grade separation. The court noted the claim of unconstitutionality "rests wholly upon the special facts here shown" (294 *U. S.*, at *p*. 413, 55 *S. Ct.*, at *p*. 487, 79 *L. Ed.*, at *p*. 954). We need not list all those special facts. They included the claim that the highway was part of a state-wide and nationwide plan to foster commerce by motor vehicle, thus providing sharp competition for the railroads from truckers who contributed nothing to the cost, and an allegation that the new highway was not built to meet a local traffic need. The court noted that in all of its prior cases sustaining the liability of railroads, "the new highway was an incident of the growth or development of the municipality in which it was located" (294 *U. S.*, at *p*. 430, 55 *S. Ct.*, at *p*. 495, 79 *L. Ed.*, at *p*. 964). The court expressed no view upon the merits of the constitutional issue, holding only that the state Supreme Court should have considered it, the majority remanding to that end while the dissenters would have affirmed. We add that in a later case it was held the cost need not be allocated on the basis of benefits conferred by the grade

separation. *Atchison, T. & S. F. Ry. v. Public Utilities Comm.,* 346 *U. S.* 346, 74 *S. Ct.* 92, 98 *L. Ed.* 51 (1953).

It is far from clear that the doctrine of those cases is at all pertinent. They involved the *private* right of way of a railroad, whereas in our situation the utility has only a subordinate interest in the public's own right of way. We are not aware of any case which suggests that due process could demand that the public assume a burden in its use of its own property notwithstanding that the interest it gave the utility was subordinate to the public's full and unfettered use of that property under the local law at the time of the grant. In fact the usual constitutional challenge in this area runs the the other way, it being questioned whether to relieve a utility of its obligation constitutes a gift of public funds in violation of the familiar provision of state constitutions. Most courts have rejected that attack. Annotation, 75 *A. L. R. 2d* 419 (1961); Note, 17 *Rutgers L. Rev.* 233 (1962); *Jones v. Burns,* 138 *Mont.* 268, 357 *P. 2d* 22 (*Sup. Ct.* 1960); *State Highway Dep't v. Delaware Power & Light Co., Del.,* 167 *A. 2d* 27 (*Sup. Ct.* 1961); *State ex rel. City of Albuquerque v. Lavender,* 69 *N. M.* 220, 365 *P. 2d* 652 (*Sup. Ct.* 1961); *State Road Comm. of Utah v. Utah Power & Light Co.,* 10 *Utah 2d* 333, 353 *P. 2d* 171 (*Sup. Ct.* 1960). See *Wilson v. City of Long Branch,* 27 *N. J.* 360, 377 (1958), where we rejected a different attack upon a relocation cost provision in an act relating to blighted areas.

In any event we see no resemblance between the factual pattern here and that of the railroad cases. Although of course the Port of New York is of great moment to the nation as a whole, still it is the jewel of the Port District. These improvements are for the substantial and immediate benefit of the millions of citizens who live and work there, who need the free flow of traffic between the States to meet their business and personal needs, and who profit as well from the commercial contribution of the terminal facilities at Port Newark. In short, these improvements are intimately related

to and required by the development and growth of the Port District itself.

The judgment in the Hackensack Water Company case is affirmed. The judgments in the Public Service Electric and Gas Company and New Jersey Bell Telephone Company cases are reversed and the causes remanded for proceedings in harmony with this opinion.

Hackensack Water Company:

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL and HANEMAN—6.

*For reversal*—None.

Public Service Electric and Gas Company and New Jersey Bell Telephone Company:

*For reversal* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL and HANEMAN—6.

*For affirmance*—None.