JERSEY CENTRAL POWER & LIGHT CO., PLAINTIFF, v. TOWNSHIP OF LAKEWOOD, DEFENDANT.

Superior Court of New Jersey
Law Division Ocean County

Decided May 12, 1980.

*Richard S. Cohen* for plaintiff.
*John F. Briscoe* for defendant.

SERPENTELLI, J. S. C.

In this action in lieu of prerogative writs the core issue is whether plaintiff, a public utility, must at its own expense relocate poles, anchor guys and related equipment which were placed in the bed of a now vacated street pursuant to an easement granted to plaintiff by defendant township so that the industrial commission of that township may pursue development plans in the area heretofore occupied by the easement. In the court's view, resolution of this question depends upon an interpretation of the scope of the Supreme Court's opinion in *Port of New York Auth. v. Hackensack Water Co.*, 41 *N.J.* 90 (1963) (hereinafter *Port Authority*). That case held that public utilities were required to absorb the costs of relocation of their facilities necessitated by virtue of improvements undertaken by the Port Authority of New York with respect to the George Washington Bridge, Holland and Lincoln Tunnels and Port Newark Marine Terminal. The question here is whether this common law principle should apply to the following factual setting.

On February 24, 1967 defendant granted a right-of-way to plaintiff and New Jersey Bell Telephone Company to install nine poles and four anchor guys on defendant's premises. The purpose of the grant was to enable plaintiff to provide electrical utility service to a private industrial facility owned by Specialty Woodcraft, Inc.

The consideration for the easement was one dollar. It was granted along the path of a paper street known as Autumn Avenue and across lands known on the tax map as Block 408, owned by the township and located east of Autumn Avenue. The plant of Specialty Woodcraft, Inc. had been newly constructed in 1967 on lands acquired from the Lakewood Industrial Commission, a body corporate organized pursuant to *N.J.S.A.* 40:55B-1 *et seq.* as a result of efforts made by the Commission to attract new industrial users to the township. The decision to place these utility poles and facilities in the bed of proposed Autumn Avenue and across other township lands was made jointly by the Lakewood Industrial Commission and Specialty

Woodcraft, Inc. in cooperation with Jersey Central Power and Light Company. As noted, Autumn Avenue was merely a paper street at this time, that is, an unimproved street appearing on a map filed in the county clerk's office on January 9, 1920 pursuant to *N.J.S.A.* 46:23–1 *et seq.* The street was never improved by defendant nor had defendant ever formally accepted a dedication of it.

Indeed, on February 10, 1972 the township vacated Autumn Avenue and Herman Street, Harriet Street, Kurz Street and Winter Avenue, all located in the same general vicinity of Autumn Avenue, at the suggestion and request of the Industrial Commission. The Commission had entered into negotiations with a potential industrial developer which would have resulted in the Commission conveying a large tract of land, including these five streets, had the negotiations been successful. For reasons not here relevant, the sale was never consummated. However, these streets remain vacated.

On or about June 30, 1970, the Industrial Commission entered into a contract with Lakewood Quality Egg Co., Inc. to sell certain township lands known as Block 396 on the tax map, a parcel of land in proximity to the land that is the subject of this suit, with the proviso that the Industrial Commission would extend water and sewer service to the property and that Lakewood Quality Egg would build an industrial building thereon. The Commission was unable to extend the water and sewer service to Block 396 and, as a result, Lakewood Quality Egg filed suit against the Commission. That suit resulted in a consent judgment being entered on March 26, 1976, whereby the Industrial Commission agreed to sell Blocks 405–408 to Lakewood Quality Egg in lieu of Block 396. The closing was scheduled in February 1978. However, the Commission was unable then to convey clear title because of the property being encumbered by the right-of-way grant to plaintiff and by the utility poles which were still located in the bed of vacated Autumn Avenue and east of Autumn Avenue in Block 408.

The township then instituted proceedings pursuant to *N.J.S.A.* 40:67–7 to compel Jersey Central Power and Light to relocate its

poles from the easement area to Summer Avenue, an improved street located 200 feet west of Autumn and running parallel therewith. Summer Avenue had apparently been improved by another owner within the industrial complex sometime in 1974. On June 7, 1979 the township adopted a resolution ordering plaintiff to perform such relocation within 30 days at its own expense.

Plaintiff has removed the poles pursuant to a consent order, is about to release the unneeded portion of its easement and right-of-way, and the parties have reserved the issue of liability for the cost of removal and relocation for determination by this court. It has been stipulated that the cost of the work is $10,858, based on figures submitted by plaintiff.

At the outset defendant contends that *N.J.S.A.* 40:67–7 provided sufficient legal authority for the township to order removal of the facilities from the vacated street. That statute provides:

> When, in the making of any improvement in any municipality any street or highway therein shall be changed or altered, the governing body may by resolution, and after hearing upon notice given as herein provided, order all persons maintaining any street railway tracks, poles, wires, pipes, conduits or other structures of any kind therein, to remove the same, and relocate them therein in conformity with the changed or altered street or highway. Notice in writing of the time and place of such hearing shall be given to all interested persons by leaving a copy thereof at their place of business in the municipality with the person in charge thereof, or if no place of business shall be maintained in the municipality, then by mailing such copy to the residence of any such person, or in the case of a corporation to the principal office of any such corporation.

Suffice it to say that the plain language of the statute does not deal with the factual situation in this case. Clearly, no improvements are being made in a public street, nor is the right-of-way being changed or altered in the sense of a modification of the course of an established thoroughfare. Furthermore, our Supreme Court has held that this statute is not the source of the utility's obligation to relocate. Rather, it is the vehicle provided for fair enforcement of a subsisting obligation by providing for notice and hearing with respect to planned projects. *Port Authority* at 96.

The procedure provided by the statute is obviously more applicable to the type of factual situation involved in the *Port Authority* case. However, there the court was not dealing with a municipality, and even though it concluded that it could find a delegation of legislative authority to support its conclusion, it chose instead to rest the obligation on the utilities upon "the common law's view of the rights and responsibilities of a so-called franchise to use the public streets." (At 96). The court concluded that

A utility company is permitted to locate its lines within the public right-of-way as a use ancillary to the principal and primary use of the way by the public (citations omitted). It is permitted to use the public way because it serves a public interest, but since its venture is for gain and since in any event the primary purpose of the public easement is *the public's own use of it*, the utility's interest in the public right-of-way is subordinate to the public's enjoyment of it. Hence, the utility runs the risk that the public welfare may require changes in the road which will call for relocation of its facilities. [At 96–97; emphasis supplied]

The court hastened to add that this common law principle could not support any arbitrary action of a governmental unit nor would it apply to utility rights in what the court characterized as private property. But in the broad spectrum of discretionary governmental action the paramount interests of the public require that the police power not be impeded by requiring the public to shoulder the burden of moving the utilities.

Even if I had the authority to quarrel with the court's approach, I could find no basis to do so. From the standpoint of sound policy and equity, it is evident the result is eminently sound. But does the same reasoning apply with equal force in this case? I submit it does not.

Plaintiff argues that this case is completely distinguishable from *Port Authority* because there is no public road involved. It is asserted that when Autumn Avenue was vacated in 1972, not even a paper street existed and the easement merely encumbered municipal lands since defendant owned the land abutting both sides of the street. However, this contention ignores the fact that the court in *Port Authority* said "that the public's paramount right is not confined to travel but rather embraces all public uses." Plaintiff characterizes this statement as a

dictum. Even if I accept the description, it certainly is powerful dictum which cannot be ignored. Instead, it must be interpreted.

It could be argued that the *Port Authority* holding can be distinguished in this case on the basis of the fact that the Industrial Commission is engaged in a proprietary function and that the *Port Authority* case expressly excluded private property cases from its holding. Indeed, in his opinion in that case Chief Justice Weintraub (at 104) recognized that the distinction between governmental and proprietary functions still might have some vitality as it relates to certain types of municipal functions. However, he acknowledged that the distinction between governmental and proprietary functions is always unsatisfactory. I would prefer also to rest the result on other grounds.

■ The facts in this matter reveal that in 1967 plaintiff installed its facilities in the bed of an unimproved street to accommodate the needs of the development plans of the Industrial Commission and one of its clients. Autumn Avenue was not then and never after became a public way. No paramount public interest was developed in that roadway except for the fact that at some future date, the township chose to vacate the road for some undefined purpose. Indeed, counsel for defendant tacitly conceded during oral argument that the placement of the poles in Autumn Avenue was virtually a pure happenstance not based on any preconceived plan of development of that street. The facilities have never been "ancillary" to a primary public use.

By a pure quirk of fate, the Industrial Commission found a need for the lands within the bed of the street when it was compelled through litigation to provide a purchaser with an alternative site because it could not perform under a contract to convey other lands due to the unavailability of sewer and water service. Even though Autumn Avenue had been vacated in 1972, the township took no action concerning plaintiff's easement until 1979 when, under force of court order, it was

compelled to convey clear title to the lands encumbered by the easement so that it could perform its contractual undertaking to another purchaser. At that point plaintiff was not being called upon to accommodate the "paramount interests" of the public in the sense intended by the *Port Authority* case. Rather, it was being told to move over so that the Lakewood Industrial Commission, in furtherance of its plan of development and *under court order*, could provide unencumbered lands to its new occupant.

The weight of sound public policy and equity so obviously present in the *Port Authority* decision appears to have scant applicability in this setting. What is to prevent defendant through its Industrial Commission from again modifying its plans and deciding that perhaps Summer Avenue (the site to which the facilities were relocated) should be vacated to accommodate construction and once more mandating displacement of the facilities? During oral argument counsel for defendant conceded that if the need for relocation of public utility facilities occurred in connection with the expansion of public buildings when those facilities were located on public lands as opposed to a street, the municipal body would have to pay. Is that not precisely what has occurred in this case?

In short, it appears to me that the underpinning of the decision in *Port Authority* is the general public need or, as the Court characterized it, "the public's paramount right in the streets." For defendant to seek to derive its power to make plaintiff relocate at its expense is to abuse the spirit of the *Port Authority* case and to place a wholly unwarranted emphasis on the fact that Autumn Avenue was at one time a "street"—albeit a paper street. In point of fact, a public interest never attached to it. The right-of-way was never used for travel nor was it formally accepted. Furthermore, in 1972, by virtue of the vacation, it was encompassed within the adjacent municipal land and thereby lost any claim of being a public right-of-way.

As noted, the *Port Authority* case did not confine the paramount public interest to travel, but rather embraced "all public uses." (At 100). However, both the intent and the letter of

that decision dictate that paramount public interests must be involved and the exercise of those interests must not be arbitrary. (At 98). In the peculiar factual context of this case I find no compelling paramount public interest dictating that plaintiff should bear the costs of relocation and, indeed, I conclude it would be arbitrary to require the plaintiff to do so.

I therefore direct that the Township of Lakewood reimburse plaintiff for the total cost of relocation, stipulated at $10,858.