217 N.J. Super. 481 (1987)
526 A.2d 259
SUSSEX RURAL ELECTRIC COOPERATIVE, PLAINTIFF-APPELLANT,
v.
TOWNSHIP OF WANTAGE, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued March 24, 1987.
Decided May 13, 1987.
*483 Before Judges GAULKIN, BAIME and ASHBEY.
*484 Howard P. Shaw argued the cause for appellant (Farrell, Curtis & Davidson, attorneys).
Kenneth N. Laptook argued the cause for respondent (Kimmelman, Wolff & Samson, attorneys; N. Janine Dickey, on the brief).
The opinion of the court was delivered by GAULKIN, J.A.D.
Sussex Rural Electric Cooperative (Sussex) brought this action to recover from the Township of Wantage (Wantage) its costs incurred in relocating poles, wires and other equipment as required by Wantage in connection with the widening and improving of roads along which the Sussex utilities had been placed. The Law Division judge held that Sussex must absorb the costs and accordingly granted summary judgment in favor of Wantage. Sussex now appeals.

I.
Sussex supplies electric power to the area of Wantage known as Lake Neepaulin. In 1953 the entire area, comprising some 500 acres, was owned by William Pearson and his wife. On July 1, 1953 Pearson granted Sussex "the right to enter upon" his land
to place, construct, operate, repair, maintain, relocate and replace thereon and in or upon all streets, roads or highways, abutting said lands an electric transmission or distribution line or system....
At the time of the grant, the tract was entirely undeveloped and there were no roads, improved or unimproved.
Between 1955 and 1958 maps were filed proposing a subdivision for all of Lake Neepaulin. The maps showed proposed roads which had not yet been cleared of vegetation. After the maps were filed, the developers built dirt roads located as the maps indicated, but of narrower width. Various lots in the subdivision were conveyed out; each deed explicitly stated that *485 "no dedication of public use of roads, streets, avenues, ways or beaches is intended to be made by the conveyance hereunder."
Sussex began placing electric poles and wires along the cleared roads as early as 1956. The poles were placed outside the cleared portion of the roads but inside the road boundaries as shown on the filed maps. Until 1975 the roads were privately owned by the developers of Lake Neepaulin and their successors. Between 1975 and 1979, the then owner of the roads deeded them to Wantage, which adopted ordinances formally accepting them as public roads. The dedications and acceptances included all the land within the road boundaries as shown on the filed maps.[1]
Wantage then began to widen and pave the roads and, to do so, required Sussex to relocate its poles and lines. See N.J.S.A. 40:67-7 to 9. Sussex did the relocation work at its own cost but reserved its rights against Wantage. Sussex then brought this action to recover its expenses "in excess of $32,000," claiming that the required relocation constituted a compensable taking. The trial judge rejected that contention, holding that the relocation cost "is a consequential expense [Sussex] must bear as a cost of doing business" and that Sussex had "failed to demonstrate any significant diminution of its rights under the Pearson easement grant to constitute a `taking' mandating compensation."

*486 II.
Whether governmental action amounts to a taking of property is always "a vexing and thorny problem." Washington Market Enterprises, Inc. v. Trenton, 68 N.J. 107, 116 (1975). If there is a taking, both the Federal and New Jersey Constitutions require the payment of compensation. U.S. Const., Amend. V; N.J. Const. (1947), Art. I, par. 20. If there is no taking then "any loss that may have been suffered is damnum absque injuria; there has been a noncompensable governmental exercise of the police power." Washington Market Enterprises, 68 N.J. at 116. Whether the governmental action is so "onerous" as to constitute a taking depends on the facts of each case. Joseph H. Reinfeld, Inc. v. Schieffelin & Co., 94 N.J. 400, 420 (1983) (quoting Lom-Ran Corp. v. Dep't of Environmental Protection, 163 N.J. Super. 376, 386 (App.Div. 1978)).
Sussex and Wantage agree that where a utility is permitted to locate its lines within an existing public right of way, the utility's interest in the public way is subordinate to the public's enjoyment of it. Since "the utility runs the risk that the public welfare may require changes in the road which will call for relocation of its facilities," its costs of relocation are not compensable. Port of N.Y. Auth. v. Hackensack Water Co., 41 N.J. 90, 96-97 (1963). Sussex bases its claim on what it urges is the corollary rule: where utility lines originally placed on private property are required to be relocated to accommodate a subsequently created public right of way, the utility is entitled to be compensated for its relocation costs. See Panhandle Eastern Pipe Line Co. v. State Highway Comm., 294 U.S. 613, 55 S.Ct. 563, 79 L.Ed. 1090 (1935); City of Grand Prairie v. American Tel. & Tel. Co., 405 F.2d 1144 (5th Cir.1969); Tennessee v. United States, 256 F.2d 244 (6th Cir.1958); American Tel. & Tel. Co. v. Madison Parish Police Jury, 465 F. Supp. 168 (W.D.La. 1977); City of Little Rock v. Arkansas Louisiana Gas Co., 261 Ark. 347, 548 S.W.2d 133, 134 (1977); Dept. of Transp. v. Louisville G. & E. Co., 526 S.W.2d 820 (Ky. 1975); *487 Morris & Essex R.R. v. Orange, 63 N.J.L. 252 (E. & A. 1899); Magnolia Pipe Line Co. v. City of Tyler, 348 S.W.2d 537 (Tex.Civ.App. 1961).
Wantage disputes that reading of the case law. Contending that the cases do not draw a distinction "between a private versus public origin of the property right," Wantage points to the following circumstances which it claims justify the denial of compensation here:
1. That by the terms of its easement, the utility was the recipient of a general right of way easement.
2. That no specific location for the utility's transmission lines was ever granted.
3. That the utility's easement rights were granted to facilitate the development of the Lake Neepaulin subdivision and that the utility was given the opportunity to expand its electric services to new customers consistent with the developer's subdivision scheme.
4. That the utility produced no evidence to suggest that it was impaired in maintaining its equipment or in serving its customers as efficiently and satisfactorily as before the relocation of its poles.
We find, contrary to Wantage's contention, that whether the utility lines were initially placed along public or private rights of way is of critical significance. Indeed, that distinction is central to the holding in Port of N.Y. Auth. v. Hackensack Water Co., supra, where Chief Justice Weintraub was careful to point out that the utility was not entitled to compensation because
[t]he public's right in the public easement antedates and is superior to the additional interest the utility obtains from the owner of the fee. Accordingly, when the public claims its paramount right in the public easement, the utility cannot resist that right on the basis of the subordinate grant from the abutting owner. 41 N.J. at 99.
On the other hand, where the utility's right antedates the public's right, it is commonly held that the right of the utility is paramount and that the public can displace the utility only by paying compensation. Thus, in Magnolia Pipe Line Co. v. City of Tyler, supra, Magnolia obtained easements from private owners to construct a pipe line through an unimproved rural area. The land was later subdivided and streets in the subdivision were dedicated to the city. When the city decided *488 to grade and pave the streets, it required the pipe line to be moved. The court found the relocation to be a compensable taking, noting that the case is "clearly distinguishable" from those cases in which "a pipe line was laid under an existing street, highway or road under a franchise." 348 S.W.2d at 543.
Similarly, in City of Grand Prairie v. American Tel. & Tel. Co., supra, a telephone company acquired easements on private property and installed cables and conduits. The city later became the owner of a right of way across the properties to construct a public street and, in connection with its street improvements, required the telephone company to remove or lower its facilities. In holding the costs to be compensable by the city, the court observed that where a utility installs facilities in the public way "there is an implied condition that the facilities shall not interfere with the public use, either at the time they are placed in position or thereafter"; but where the lines were located on a private easement before the city acquired its intersecting easement, the city had to pay the relocation expenses. 405 F.2d at 1146.
State ex rel. Herman v. Electric Dist. No. 2, 106 Ariz. 242, 474 P.2d 833 (1970) used the same reasoning to reach the same result. There the utility erected power lines along the shoulder of what it thought was a public road. The road was later determined to be private property; it was not dedicated to public use until after the utility had placed its lines. The lines were then required to be relocated to accommodate road improvements. Finding a compensable taking, the court held that, while a utility generally must absorb the cost of relocating its lines within a public right of way, "an exception to the general rule exists where the line was there before the dedication of the street or the acquisition of the road by the public body making the road improvement." 474 P.2d at 835.
It is true, as Wantage argues and the trial judge noted, that Sussex had been granted a general easement, i.e., without specification of the course over which its lines were to be *489 placed. Wantage urges that a utility owning a general easement does not acquire rights to a specific location and thus can be relocated "at its own expense when necessitated by public needs." The trial judge stated a somewhat similar conclusion, reasoning that the fixing of a new course for its lines did not deprive Sussex "of its essential right to place, operate and maintain an electric transmission line or system pursuant to the Pearson easement grant." Both Wantage and the trial judge, however, rely on the same authorities, New Orleans Gas Light Co. v. Drainage Comm. of New Orleans, 197 U.S. 453, 25 S.Ct. 471, 49 L.Ed. 831 (1905), Chicago B. & Q. Railway Co. v. Illinois, 200 U.S. 561, 26 S.Ct. 341, 50 L.Ed. 596 (1906) and N.J. Bell Tel. Co. v. Delaware River Joint Comm., 125 N.J.L. 235 (Sup.Ct. 1940).
We find none of those cases to support the conclusions urged. In New Orleans Gas Light Co., supra, the utility had acquired a franchise to supply gas to the City of New Orleans "through pipes and mains laid in the streets" and thereupon "availed itself of the right to locate its pipes under the streets of the city." 197 U.S. at 458, 25 S.Ct. at 472. The utility was later required to shift its mains and pipes to another location in the streets in order to accommodate a municipal drainage system. The court noted that the franchise did not give the utility "the right to any particular location in the streets" and held that
when [the utility] located its pipes it was at the risk that they might be, at some future time, disturbed, when the State might require for a necessary public use that changes in location be made.
Id. at 461, 25 S.Ct. at 473. New Orleans Gas Light Co., then, does not turn on the presence of a general rather than a specific easement. Rather, it is but another example of the rule stated in Port of N.Y. Auth. v. Hackensack Water Co., supra, to which neither party here takes exception.
Similarly, in Chicago B. & Q. Railway Co., supra, a railroad had built a bridge over a creek, supporting the structure with timbers and stones placed in the creek. The State of Illinois determined to widen and deepen the creek to provide drainage *490 for adjoining lands. Likening the rights of the public in the stream to those in a public highway, the court held that the costs of alterations to the bridge necessitated by the present needs of the public were to be borne solely by the railroad. 200 U.S. at 595, 26 S.Ct. at 351. Thus Chicago B. & Q. Railway Co. is again an expression of the undisputed rule stated in Port of N.Y. Auth. v. Hackensack Water Co.
In N.J. Bell Tel. Co., supra, there is no specific suggestion that the utility had a general rather than a specific easement. There the telephone company had placed its lines under the public streets "under ordinance from and contract with the City of Camden." The Delaware River Joint Commission opened up certain streets to build a subway thus necessitating a relocation of the telephone equipment to the end that both the telephone company and the subway would share the street subsurfaces. Essentially for the reasons stated in Port of N.Y. Auth. v. Hackensack Water Co., the utility was held not entitled to compensation. See 125 N.J.L. at 238-239.
None of the cases thus relied upon by Wantage and the trial judge thus support the argument that a utility having a general easement has lesser rights than if it had a specific easement. Indeed, we note that an easement which is granted without fixing a specific location does not constitute a grant of unlimited use of the property. 2 Thompson On Real Property, § 387 at 544-545 (1980). The owner of the servient tenement may fix the location or, failing that, the owner of the dominant tenament may fix the location. Ibid. The particular course must be a reasonable one for both parties. Id. at 545-546. Once the way is fixed, it cannot be changed without the consent of both parties. Id. at 547. It follows then that once Sussex had placed its lines, its easement rights were essentially the same as they would have been had the particular course been fixed by the easement grant.
We also find unwarranted the reliance placed by the trial judge and Wantage on the fact that the required relocation *491 did not impair Sussex's ability to deliver electrical service. Surely, municipal action which terminates or substantially impairs the delivery of utility services can result in a compensable taking. See, e.g., Buckeye Pipe Line Co. v. Keating, 229 F.2d 795, 798 (7th Cir.1956), cert. den., 352 U.S. 830, 77 S.Ct. 44, 1 L.Ed.2d 51 (1956) ("[T]he property of the owner of an easement is taken from him not necessarily when the adverse party occupies the land, but only when he prevents or interferes with the owner's use of the easement."). But in all of the cases discussed above in which utility relocation costs were found compensable, the ability of the utility to deliver its services appears to have been entirely unaffected by the relocation. We find neither reason nor authority to hold that the costs of the relocation must go uncompensated simply because Sussex retains its easement and can satisfactorily and efficiently provide electric service to its customers.
Finally, we reject Wantage's contention that compensation should be denied here, because Sussex placed its lines specifically to accommodate the subdivision development, of which the roads were a critical part. The fact remains that the lines were placed when the public had no interest in the roads. The teaching of the authorities we have discussed is that when the public takes a right of way and requires that preexisting utility facilities be displaced, the public must pay the cost associated with its acquisition.
In sum, we conclude on the facts here that Wantage's mandated relocation of the Sussex poles and lines constituted a compensable taking.[2] The order granting summary judgment is accordingly reversed and the matter is remanded to the Law *492 Division for all further proceedings. We do not retain jurisdiction.
NOTES
[1] The parties stipulated at trial that the filing of the maps constituted a dedication of the paper streets. As already noted, the subsequent proofs showed that until the formal street dedications and acceptances in and after 1975 all lot conveyances were by deeds which recited that "no dedication of public use of roads, streets, avenues, ways or beaches is intended to be made by the conveyance hereunder." The trial judge found it unnecessary to decide whether any dedication took place before 1975. At oral argument, however, counsel acknowledged that the stipulation was in error. See generally, Velasco v. Goldman Builders, Inc., 93 N.J. Super. 123 (App.Div. 1966); Cunningham and Tischler, Dedication of Land in New Jersey, 15 Rutgers L. Rev. 377 (1961). We note moreover that the parties do not suggest, nor does the record indicate, any source of dedication arising from any municipal ordinance or action prior to 1975.
[2] The record is unclear as to whether all of the poles and lines were installed by Sussex prior to the dedication of the streets commencing in 1975. If any Sussex facilities were initially placed in existing public rights of way, the relocation costs would fall solely on Sussex. Whether and to what extent any of the facilities were initially placed in public rights of way can be explored at the damages hearing.